**Raymond OLIVAS, Appellant**

v.

**The STATE of Texas.**

**No. PD–1936–04.**

Court of Criminal Appeals of Texas.

Oct. 4, 2006.

Stephen Gustitis, Bryan, for appellant.

Douglas Howell, III, Asst. D.A., Bryan, Matthew Paul, State's Attorney, Austin, for state.

## OPINION

COCHRAN, J., delivered the opinion of the Court, in which MEYERS, WOMACK, JOHNSON, and HOLCOMB, JJ., joined.

A jury convicted appellant of aggravated assault by threat, stalking, and four separate instances of evading arrest, all stemming from his futile, month-long attempt to resurrect a short-lived affair with a married woman. On appeal, he argued that the evidence was insufficient to prove assault by threat because the State failed to prove that the assault victim knew that appellant had shot at her truck at the time that he acted. The court of appeals, finding the evidence legally insufficient, reversed and rendered a judgment of acquittal.[1] The State argues first that the court of appeals erred in finding the evidence insufficient, and second that this Court should reconsider its decision in *McGowan v. State*, 664 S.W.2d 355 (Tex.Crim.App. 1984), which, according to the State, "requires a victim to perceive a threat at the time the offense occurred" to establish assault by threat.[2] We conclude that

*McGowan* held only that assault by threat requires the defendant to communicate a threat of imminent bodily injury; stabbing someone without first threatening him is a different assaultive offense.[3] We hold that the evidence in the present case, viewed in the light most favorable to the verdict, is legally sufficient to support the assault-by-threat conviction. We therefore reverse the judgment of the court of appeals and remand the case to that court for further proceedings.

### I.

Appellant began stalking and harassing the complainant, Kim Tunnell, in November, 2001. Ms. Tunnell had been romantically involved with appellant, but, after deciding to attempt reconciliation with her husband, she ended the relationship. Appellant began calling Ms. Tunnell and leaving voice messages on her cell phone. While the messages were initially innocuous, they became increasingly violent and demanding.[4] Ms. Tunnell began to fear

---

1. *Olivas v. State*, No. 10–02–00311–CR, 2004 WL 2566607, 2004 Tex.App. LEXIS 10131 (Tex.App.-Waco 2004) (not designated for publication). The court of appeals affirmed appellant's stalking conviction in the same opinion, and reversed three of his four convictions for evading arrest in a separate opinion. *Olivas v. State*, No. 10–02–00312–CR, 2004 WL 2566742, 2004 Tex.App. LEXIS 10134 (Tex.App.-Waco 2004) (not designated for publication). We granted the State's petitions for discretionary review in both cases.

2. The State's grounds for review are:
   1) Did the court of appeals incorrectly apply a legal sufficiency review and err in concluding that the evidence was insufficient?
   2) Should this Court reconsider the holding in *McGowan v. State*, 664 S.W.2d 355 (Tex.Crim.App.1984), which requires a victim to perceive a threat at the time the offense occurred?

3. *McGowan*, 664 S.W.2d at 357.

4. The messages included statements such as:

   ● ●"Please just talk to me. Just pick up your phone. I don't want—I wouldn't hurt you. I wouldn't hurt your husband.... I know the value of love of children and the importance of that. I don't care how much I hate somebody, I wouldn't do that. And this isn't about your husband or this isn't about you. This is about me and my life."

   ● ●"Kim—pick up the phone. Why you want to hurt me so bad? Why do you want to make me so angry? It ain't f\* \* \*ing worth it, Kim—if I knew where that motherf\* \* \*er lived I'd go over there and f\* \* \*ing kill him right now. I'm sure—because I'm sure you've been there...."

   ● ●"You gonna stay up to 2:30 in the morning again, huh? Do you think that's going to stop me from something, Kim? Do you think anything is going to f\* \* \*ing stop me from something? You're playing on my f\* \* \*ing emotions. Nothing can f\* \* \*ing stop me ..."

for her safety, so, on November 27, 2001, she recorded the messages that appellant had left over a two-week period and took that recording to the police. She then went to her attorney to get a restraining order against appellant. When she arrived at her attorney's office, she saw appellant in the parking lot, walking toward her truck. As she tried to back out of the parking lot to avoid him, he began hitting the passenger side window with a pistol. Ms. Tunnell sped off. After she was sure appellant was not following her, she returned to her attorney's office, and her attorney called the police.

Just two weeks later, on December 12, 2001, Ms. Tunnell was driving to the laundromat when appellant drove up behind her. He then drove his car into the on-coming-traffic lane, and Ms. Tunnell noticed that the front passenger window was rolled half-way down. She recognized the car-it belonged to appellant's mother-but she could not immediately tell who was driving it.[5] She heard a "pop," followed by another "pop," and thought that appellant had possibly thrown rocks at her truck. She pulled into the parking lot at the laundromat and immediately got out of her truck to see what the popping noises had been. Appellant turned into a different entrance and drove past Ms. Tunnell; as she had suspected, it was appellant driving his mother's car. After he left, she discovered a bullet hole in the rear driver's side extended-cab portion of her truck, and she

immediately called the police. Ms. Tunnell testified that seeing the bullet hole made her feel "shocked," "upset," and "scared." She further testified that she "took [appellant's actions] as intent to harm." She "really didn't know if he intended to kill [her] or what the deal was." As the police conducted their investigation at the laundromat, appellant again called Ms. Tunnell on her cell phone. She gave the officers the number he was calling from. The police attempted to arrest appellant, but he led them on a chase and eventually escaped.

Appellant called Ms. Tunnell on several occasions following this incident. On two of those occasions, the police were able to find appellant, but both times he led the police on high-speed chases and was able to escape arrest.[6] Finally, the police worked with Ms. Tunnell to set up a meeting between her and appellant so that they could arrest him. She agreed, and, on December 27, 2001, the police finally arrested appellant.

A jury convicted appellant and sentenced him to 35 years in prison. He appealed, arguing that the State failed to prove the element of "threaten with imminent bodily injury." He argued that, because Ms. Tunnell did not realize that he was shooting at her car while he was committing the act, she had not been "threatened" as required under Texas Penal Code Section 22.01(a)(2). The court of appeals

● ● "This s* * * again. Start a new f* * *ing case, Kim. Is that what your bulls* * * is all about?—worst thing you could do."

● ● "Keep this s* * * up, see what happens. See what happens. You're writing your own f* * *ing destiny. . . ."

● ● "Pick up the damn phone before I f* * *ing come over there break through the f* * *ing front door."

● ● "[F]* * *ing lock yourself in your house— I guess you'll have to see, won't you ... you're going to f* * *ing pay for it. I

learned my lesson the first time—count your friggin' hours."

5. Ms. Tunnell stated that she suspected that it was appellant "the entire time" but she did not know for sure until she was standing outside of her truck in the laundromat parking lot.

6. These chases, along with the chase on December 12, 2001, are the bases of the three convictions for evading arrest.

found that Ms. Tunnell "did not perceive the threat at the time the offense occurred," and thus, under this Court's rule in *McGowan,* the State had not proven that Ms. Tunnell was threatened with imminent bodily injury.[7]

## II.

Historically, the term assault was used to describe two different acts-one subject to criminal liability and the other subject to civil liability. Early criminal assault was defined as an "attempt to commit a battery."[8] Battery was the crime of physically hitting or injuring another.[9] Thus, criminal assault was the (unsuccessful) attempt to physically hit or injure another. In civil tort law, assault was committed when an actor "with intent to cause a reasonable apprehension of immediate bodily harm, [did] some act which cause[d] such apprehension."[10] Civil assault was a verbal or physical threat made with the intent to place another in fear of physical injury and the threat does, in fact, place that person in fear. However, many states statutorily expanded the narrow common-law definition of criminal assault to include the tort-based definition of assault as well.[11] Thus, "assault and battery" was both the successfully communicated threat to physically injure and the actual act of doing so-carrying through on that threat.[12] The tort-based theory is the foundation for most assault-by-threat statutes now in existence. The Model Penal Code includes such a provision: "A person is guilty of assault if he ... attempts by physical menace to put another in fear of imminent serious bodily injury."[13]

Nearly every jurisdiction now statutorily criminalizes assault by threat in some manner, and most statutes specify whether the threat must be perceived or received by the intended victim. For example, Colorado enacted a statute criminalizing menacing: "A person commits the crime of menacing if, by any threat or physical action, he or she knowingly places or attempts to place another person in fear of imminent serious bodily injury."[14] This

---

**7.** *Olivas,* 2004 WL 2566607 at *1, 2004 Tex. App. LEXIS 10131 at *3.

**8.** *See* MODEL PENAL CODE § 211.1, cmt. at 176–77 (1980).

**9.** *Id.*

**10.** 2 WAYNE R. LAFAVE, SUBSTANTIVE CRIMINAL LAW § 16.3(b) at 568 (2d ed.2003). For example, "if, with the intention of hitting X, D wrongfully threw a stone that X barely managed to dodge, then D would have been guilty of a criminal assault because he had attempted to commit a battery, and he would also have been liable in civil action of trespass for assault because he had wrongfully placed X in apprehension of physical harm." ROLLIN M. PERKINS, CRIMINAL LAW 159 (3d ed.1982). If, on the other hand, D-an ace pitcher-had thrown the stone intending to scare X but carefully aiming his fastball four inches above X's head (acting with the intent to frighten X, but not to physically harm him), then X would be liable for civil assault, but not guilty of criminal assault under the common law.

**11.** MODEL PENAL CODE § 211.1, cmt. at 177 (noting that "[t]he majority of jurisdictions at the time the Model Code was drafted had assimilated this civil notion of assault into the criminal law"). *See, e.g.,* ALASKA STAT. § 11.41.230 ("A person commits the crime of assault in the fourth degree if ... by words or other conduct that person recklessly places another person in fear of imminent physical injury."). According to Professor Perkins,

An assault is (1) an *attempt to commit battery* or (2) an *intentional placing of another in apprehension of receiving an immediate battery.* Furthermore, (3) an assault is included in any actual battery.

PERKINS at 159.

**12.** PERKINS at 159.

**13.** MODEL PENAL CODE § 211.1(1)(c).

**14.** COLO.REV.STAT. § 18–3–206(1).

language indicates that, to commit assault, an actor need not succeed in placing a victim in fear or in causing a victim to be aware of the threat, his attempt to do so suffices.[15] In contrast, Idaho defines assault by threat to explicitly require the victim's perception: "An assault is ... [a]n intentional, unlawful threat by word or act to do violence to the person of another, coupled with an apparent ability to do so, and doing some act which creates a well-founded fear in such other person that such violence is imminent."[16] Thus, some statutes require that the victim of an assault by threat (or menacing) perceive or receive the threat, while other statutes require only that the actor communicate the threat, regardless of whether the victim actually perceives or receives that threat.

Texas's assault-by-threat statute states, in pertinent part: "A person commits an offense if the person ... intentionally or knowingly threatens another with imminent bodily injury[.]"[17] Our statute does not explicitly indicate whether the intended victim must perceive or receive the threat. The question turns on the meaning of the term "threaten" as used in the Penal Code. Does it mean an act that must be perceived by the intended victim? Or

must the actor only act with the intent that the victim perceive his threat?

■ When determining a statute's meaning, a court must first attempt to interpret the statute based on the plain meaning of the words used.[18] The word "threaten" is not statutorily defined in the Penal Code, so we turn to the common, ordinary meaning of that word. Webster's Dictionary defines "threaten" in the following manners:

1. to declare an intention of hurting or punishing; to make threats against;

2. to be a menacing indication of (something dangerous, evil, etc.); as the clouds *threaten* rain or a storm;

3. to express intention to inflict (injury, retaliation, etc.);

4. to be a source of danger, harm, etc. to.[19]

Significantly, each of these definitions indicates an act being performed, as opposed to an act which is perceived by an outside party. Thus, these definitions indicate that a threat occurs, not when the victim perceives the threat, but as soon as the actor utters the threatening words or otherwise initiates the threatening conduct. Black's Law Dictionary defines "threat"

**15.** *See People v. Stout*, 193 Colo. 466, 467, 568 P.2d 52, 53–54 (Colo.1977) ("The statute provides for conviction if the defendant 'attempts' to place another in fear, and thus, actual subjective fear on the part of the victim is not a necessary element of this crime."); see also OR.REV.STAT. § 163.190 ("A person commits the crime of menacing if by word or conduct the person intentionally attempts to place another person in fear of imminent serious physical injury"); *State v. Lockwood*, 43 Or.App. 639, 642–43, 603 P.2d 1231, 1233 (1979) ("Menacing consists of intentionally attempting to place another person in fear of imminent serious physical injury. The victim's subjective state of mind is not a defined element of the crime. The victim's testimony is not essential."; noting that the commentary

to the statute includes an example that the "intended victim is unaware of the actor's threat, e.g., he is blind and does not know the actor is pointing a gun at him").

**16.** IDAHO CODE ANN. § 18–901(b).

**17.** TEX. PENAL CODE § 22.01(a)(2).

**18.** *Calton v. State*, 176 S.W.3d 231, 233 (Tex. Crim.App.2005) (citing *State v. Mason*, 980 S.W.2d 635, 638 (Tex.Crim.App.1998), and *Boykin v. State*, 818 S.W.2d 782, 785 (Tex. Crim.App.1991)).

**19.** NOAH WEBSTER, WEBSTER'S NEW TWENTIETH CENTURY DICTIONARY OF THE ENGLISH LANGUAGE UNABRIDGED 1901 (2d ed.1983).

as: "A communicated intent to inflict harm or loss on another or on another's property...."[20] This could indicate either an act that is communicated by the actor to another, regardless of whether it is successfully perceived by the intended recipient, or one that is successfully communicated to the intended recipient. Thus, after analyzing the plain meaning of the statutory language, the Texas assault-by-threat statute remains ambiguous. We therefore must look outside this specific statute to discern the legislative meaning of the word "threaten."[21]

The Texas Penal Code contains two statutes, other than assault by threat, that specifically criminalize threats or threatening behavior. They are: terroristic threat[22] and robbery by threat.[23] The specific phrasing of these two statutes sheds some light on the meaning of the word "threaten" as it is used in the Texas Penal Code.

A person commits robbery by threat if "in the course of committing theft ... he ... intentionally or knowingly threatens or places another in fear of imminent bodily injury or death."[24] By defining robbery to be theft plus *either* threatening *or* placing another in fear, this statute demonstrates that the term "threaten" means something other than placing a person "in fear of imminent bodily injury or death."

Similarly, the terroristic-threat statute states: "A person commits an offense if he threatens to commit any offense involving violence to any person or property with intent to place any person in fear of imminent serious bodily injury."[25] Like robbery by threat, this statute indicates that "threaten" and "place any person in fear of imminent serious bodily injury" have two distinct meanings.[26] Both statutes imply that one can threaten without *necessarily* placing another in fear of imminent bodily injury. A logical inference from this is that "threatening," as used in the Penal Code, does not require that the intended victim perceive or receive the threat, but "placing another in fear of imminent bodily injury" does.

This interpretation of "threaten" is supported by at least one other jurisdiction. In the District of Columbia, the assault statute reads: "Whoever unlawfully assaults, or threatens another in a menacing manner, shall be fined...."[27] This language has been interpreted as focusing not on whether the victim was placed in fear by the threat, but whether the accused *intended* to instill fear in the victim:

> While certain conceptual aspects of tort theory have been absorbed into the criminal offense of assault, it is not necessarily the case that the victim must be shown factually to have experienced ap-

---

20. BLACK'S LAW DICTIONARY 1203 (7th ed.2000).

21. *Boykin,* 818 S.W.2d at 786.

22. *See* TEX. PENAL CODE § 22.07(a)(2).

23. *See* TEX. PENAL CODE § 29.02(a)(2).

24. *Id.*

25. TEX. PENAL CODE § 22.07(a)(2).

26. A person must both threaten to commit some act *and* must do so with the intent to place another in fear to be convicted of ter-

roristic threat. However, "it is not necessary that the victim or anyone else was actually placed in fear of imminent serious bodily injury.... All that is necessary to complete the offense is that the accused by his threat sought as a desired reaction to place a person in fear of imminent serious bodily injury." *Dues v. State,* 634 S.W.2d 304, 305–06 (Tex. Crim.App.1982). This interpretation is based on the plain meaning of the statute which specifically requires only the intent to "place any person in fear of imminent serious bodily injury." TEX. PENAL CODE § 22.07(a)(2).

27. D.C.CODE § 22–404(a).

prehension or fear in order to establish the offense. In our view the better position holds that although the question whether the defendant's conduct produced fear in the victim is relevant, the crucial inquiry remains whether the assailant acted in such a manner as would under the circumstances portend an immediate threat of danger to a person of reasonable sensibility.[28]

This intent-based theory of assault by threat also comports with the societal interest in establishing criminal law:

> The purpose of criminal law is to define socially intolerable conduct, and to hold conduct within the limits which are reasonably acceptable from the social point of view. If the criminal law was one hundred percent effective there would be no punishment, because there would be no conduct which overstepped the boundaries it had established. An incidental but very important function of the criminal law is to teach the difference between right and wrong.[29]

The act of threatening violates this interest not only when the actor actually causes fear in another, but also (1) when he creates an unacceptable risk that another may be placed in fear, and (2) when he increases the likelihood that he will carry through on a threat and cause a physical injury.

However, the court of appeals in the present case-as well as some other Texas courts-have interpreted this Court's reasoning in *McGowan v. State* [30] as holding that the Texas assault-by-threat and robbery-by-threat statutes require a victim to perceive a threat as it occurs-that is, the offense requires a successfully communicated threat.[31] The court of appeals rea-

---

**28.** *Anthony v. United States*, 361 A.2d 202, 206 (D.C.1976) (footnote omitted); *see also Chapman v. State*, 78 Ala. 463, 465 (Ala.1885) (noting that "one may obviously be assaulted, although in complete ignorance of the fact, and, therefore, entirely free from alarm" if the defendant intended to injure and had the ability to do so); *State v. Adamo*, 9 N.J.Super. 7, 10, 74 A.2d 341, 342 (App.Div.1950) (upholding strike leader's assault conviction on proof that he, along with others, threw stones into building where supervisors had retreated with the intent to injure anyone in the building; prosecution was not required to show that any of the supervisors were actually placed in fear of imminent bodily injury because "apprehension upon the part of a complaining witness is not an essential element of simple assault").

**29.** ROLLIN M. PERKINS, CRIMINAL LAW 5 (3d ed.1982).

**30.** 664 S.W.2d 355 (Tex.Crim.App.1984).

**31.** *See Rose v. State*, 2006 WL 1194322, *3, 2006 Tex.App. LEXIS 3705, *8 (Tex.App.-Dallas 2006, no pet. h.) (not designated for publication) (stating that evidence was sufficient to establish assault by threat because victim perceived his peril at the time defendant drove toward him in his car, and he felt threatened);

*Armitige v. State*, 1999 WL 102207, *3, 1999 Tex.App. LEXIS 1366, *7–8 (Tex.App.-San Antonio 1999, no pet.) (not designated for publication) (citing McGowan for the proposition that "[w]hen robbery is committed, the defendant must display a weapon, or demonstrate the use of a weapon, and the complainant must witness the act of display or demonstration to establish a threat"); *Richardson v. State*, 834 S.W.2d 535, 537 (Tex.App.-Houston [1st Dist.] 1992, pet. ref'd) (not designated for publication) (stating that "the *McGowan* court held the evidence was insufficient to show the defendant used a knife to threaten the complainant because the complainant never saw the defendant holding a knife, nor did she testify that defendant threatened her with a knife"). *See also Edwards v. State*, 57 S.W.3d 677, 682 (Tex.App.-Beaumont 2001, pet. ref'd) (Burgess, J. dissenting) (arguing that evidence was insufficient to show an assault by threat because police-officer victim never perceived the threat posed by the defendant; "I would urge our Court of Criminal Appeals to review this case, overrule *McGowan* and affirm the majority. But until it does so, I must follow *McGowan*."). However, other courts have read *McGowan* less restrictively, requiring only that the State present some evidence of an attempted communication of a threat to sustain an assault by threat charge. *See Ed-*

soned that, because Ms. Tunnell did not realize that appellant was shooting at her as he fired the shots, the evidence was legally insufficient under *McGowan*.[32]

*McGowan* is not that broad of a holding. That case involved a woman and her fourteen-year-old daughter who were attacked by the defendant.[33] The evidence showed that the defendant stabbed the daughter with a knife. As he then stood over her, holding the knife, the girl asked him not to cut her. The mother, not seeing the knife held by the defendant, attempted to reach down and help her daughter. As she did, the defendant stabbed the mother in the back of the head; she did not know what she had been hit with.[34] He then ran away. The mother testified that, while she knew she had been hit in the head and was bleeding, it was only after the tip of the knife was retrieved from her skull, that she realized she had been stabbed.[35] This Court held that because there was no evidence presented that the defendant threatened the mother before stabbing her, the State failed to prove the element of "threat" to the mother.[36] We affirmed the aggravated-assault-by-threat conviction against the daughter because "[t]he evidence showed that after she was initially stabbed by appellant [the daughter] saw him holding the knife and began begging appellant not to cut her. She further testified that appellant threatened her with imminent bodily injury."[37]

A careful examination of the cases relied upon in *McGowan*, as well as the language used in the opinion itself, indicates that this Court did not define assault by threat as requiring a victim's perception of the threat.[38] While the *McGowan* court did

wards, 57 S.W.3d at 680–81 (stating that the evidence supported an inference that the defendant intended to kill police-officer victim, but was thwarted by fellow officer; "As we learned from *McGowan*, however, Section 22.01(a)(2) requires proof not of an intent to commit an assault by bodily injury, but of an intent to cause in the victim a reasonable apprehension of imminent bodily injury"); *Tullos v. State*, 698 S.W.2d 488, 490 (Tex. App.-Corpus Christi 1985, no pet.) (evidence was insufficient to establish assault by threat because, as in *McGowan*, defendant simply stabbed victim without making any threat; witness "testified that the stabbing was just a spur of the moment thing, and that after the stabbing appellant made no threats"); *Eubanks v. State*, 2005 WL 19032, *4, 2005 Tex. App. LEXIS 47, *9–11 (Tex.App.-Dallas 2005, no pet.) (not designated for publication) (citing *McGowan* and stating that "the question before the jury was not whether Eubanks intended to commit an assault by bodily injury, but whether Eubanks intended for Gorman to fear imminent bodily injury").

**32.** *Olivas*, 2004 WL 2566607 at *1–2, 2004 Tex.App. LEXIS 10131 at *3–4.

**33.** *McGowan*, 664 S.W.2d at 357.

**34.** *Id*.

**35.** *Id*.

**36.** *Id*.

**37.** *Id*. at 358.

**38.** The first case relied upon in *McGowan* is *Taylor v. State*, 637 S.W.2d 929 (Tex.Crim. App.1982). In *Taylor*, the defendant and two others robbed a grocery store. One co-defendant had a gun, but the defendant and the third conspirator had no weapon. The appellant attacked the cashier, Mrs. Gregorcyk, and threatened to kill her if she did not remain quiet. He then restrained her as the other unarmed conspirator stole money from the register. The armed co-defendant was in the back of the store during the entire robbery. He threatened another store employee with the gun, but never approached Mrs. Gregorcyk. Although Mrs. Gregorcyk testified that she had seen what appeared to be the "imprint of a small pistol in the front pants pocket of the appellant's co-defendant . . . she never saw a gun displayed. She was 'placed in fear of imminent bodily injury through the . . . beating [she sustained] and not through the use of a handgun.'" *Id*. at 931. This Court found that, because the State failed to prove that the defendant used a deadly weapon to threaten Mrs. Gregorcyk, the aggravat-

refer to the mother's lack of testimony regarding comprehension of a threat, it was the lack of *any* evidence, not the mother's lack of perception of a threat, that led this Court to conclude that the State failed to prove assault by threat: "There is *no evidence* that prior to stabbing her appellant threatened her in any way." [39] That is, the defendant just stabbed her, he did not threaten her first. [40] Thus, a more accurate description of the holding in *McGowan* is that there must be *some* evidence of a threat being made to sustain a conviction of assault by threat. *McGowan* did not address the question of whether, under the Texas Penal Code, assault by threat requires an intended victim to perceive the threat. That question remains open.

## III.

■ However, we need not definitively resolve the question of whether an alleged victim must perceive the defendant's threat to establish the crime of assault by threat in this case. Even assuming, *arguendo*, that the State must prove Ms. Tunnell perceived the threat, there is legally sufficient evidence to sustain the jury's verdict. In concluding that Ms. Tunnell did not perceive a threat, the court of appeals failed to view all of the evidence in the light most favorable to the verdict. The record is replete with evidence that Ms. Tunnell felt threatened by appellant on several occasions leading up to the charged incident. While this evidence does not prove that Ms. Tunnell perceived a threat on the evening in question, it does support an inference that her state of mind on that evening was affected by appellant's previous actions. [41] If the determination of appellant's guilt turns on whether Ms. Tunnell perceived a threat, her state of mind as the event occurred would be a critical factor for a jury to consider. [42] The

---

ed robbery conviction could not stand. *Id.* at 933. We noted, however, that the evidence that appellant committed simple robbery by threat was "overwhelming, and in accordance with [the penal code statute]." *Id.*

The second case cited in *McGowan* is *Benjamin v. State,* 621 S.W.2d 617 (Tex.Crim.App. 1981). In *Benjamin,* a bystander was shot when the defendant and a co-worker began fighting. The court held that "[t]he evidence fail[ed] to establish that any threats were made" to the bystander. *Id.* at 619. That is, the bystander was simply shot; he was never threatened first.

**39.** *McGowan,* 664 S.W.2d at 357 (emphasis added).

**40.** An actor might threaten to stab by holding a knife overhead and telling the victim, "I'll kill you," or by his conduct of waving the knife in the air or making some other threatening gesture. An actor might commit attempted assault by stabbing at the victim and fortuitously missing. An actor might commit assault by successfully stabbing the victim, with or without any threats. Or he might do all three.

**41.** Appellant argues that the incidents leading up to the shooting "do not address the victim's perception and awareness of her imminent peril as the shots were being fired." We disagree. The previous incidents support a logical inference that Ms. Tunnell was in a more cautious state of mind and heightened awareness. Evidence such as the fact that she started carrying a gun and had become "cautious of [her] surroundings" supports an inference that Ms. Tunnell was more likely both to perceive a threat made by appellant and more likely to perceive his acts as constituting a threat.

**42.** The State also argues that "[the] fact that appellant continued to aggressively stalk and threaten Tunnell immediately after the December 12th offense could also be considered by a rational jury as evidence that [Ms.] Tunnell was threatened with imminent bodily injury on December 12th." While we agree that the post-December 12th evidence of stalking does tend to make it more likely that appellant's actions on December 12th were threats (or at least attempted threats), such evidence could not have been used by the jury-and cannot be used by this Court-to find

evidence regarding Ms. Tunnell's state of mind leading up to the assault showed:

- ●she felt "threatened and very uneasy" after hearing the messages that appellant left on her voice mail on November 26, 2001;

- ●she felt "threatened . . . as though he was going to do something" to her after hearing the message that appellant left on her voice mail on November 27, 2001;

- ●she recorded the messages that appellant had left on her voice mail and turned them over to the police;

- ●she went to her attorney's office to obtain a restraining order against appellant;

- ●she was "scared" and "concerned" by appellant's actions of hitting her truck window with a pistol, and left her attorney's parking lot out of fear for her safety; and

- ●she began carrying a gun "for protection" against appellant.

Furthermore, ample evidence shows that Ms. Tunnell *did* perceive the threat made by appellant at the time the offense occurred. On the evening of the charged incident:

- ●she saw a car that she knew belonged to appellant's mother's pull up behind her "at a very high rate of speed." She suspected that appellant was driving the car;

- ●she then saw the car pull up next to her, driving in the oncoming traffic lane;

- ●she heard two pops that "sounded like rocks" hitting her truck;

- ●after she arrived at her destination, she looked at the side of the car to see if appellant "had hit [her] truck with a rock or what it was";

that Ms. Tunnell was more likely to have perceived the December 12th threat when it occurred. While her subjective state of mind could have been affected by events occurring

- ●she discovered a bullet hole in the side of her truck, and immediately called the police;

- ●she was "scared" and "in disbelief" at appellant's actions and she "really didn't know if he intended to kill [her]."

This evidence indicates that Ms. Tunnell perceived a threat as appellant shot at her truck. While she did not instantaneously realize that appellant had fired shots at her, she knew that he had done *something* threatening to her. And she was frightened. The fact that Ms. Tunnell perceived some threat of imminent bodily injury, coupled with the fact that appellant did use a firearm in threatening her, is sufficient to sustain his conviction for aggravated assault as charged in the indictment. The indictment charged that appellant "did then and there intentionally, knowingly, and recklessly threaten Kim Tunnell with imminent bodily injury and did then and there use and exhibit a deadly weapon, to wit: a firearm." Nothing in this indictment-and nothing in Texas law-requires Ms. Tunnell to accurately perceive the *exact* threat that appellant communicated. At most, the State was required only to prove that Ms. Tunnell perceived a threat and that appellant did, in fact, use or exhibit a firearm while making that threat.

■ Appellant also argues that the victim of an assault by threat must be aware "of her imminent peril as the shots were being fired." The statute requires the State to prove that the defendant "threaten[ed] another with imminent bodily injury," but there is no statutory requirement that a victim must instantaneously perceive or receive that threat of imminent bodily injury as the actor is performing

before the alleged incident, it could not have been affected by those occurring after that incident.

it.[43] Ms. Tunnell did not comprehend that she was being shot at as appellant fired at her car, but the realization-moments later[44]-of what he had done nonetheless placed her in great fear.[45]

Because there is ample evidence to find that appellant threatened Ms. Tunnell as required under the Texas Penal Code, we reverse the judgment of the court of appeals and remand the case to that court to address appellant's remaining points of error.

PRICE, J., joined Parts I and III, and concurred in the judgment.

KELLER, P.J., filed a concurring opinion, in which KEASLER and HERVEY, JJ., joined.

KELLER, P.J., filed a concurring opinion in which KEASLER, and HERVEY, JJ., joined.

I agree with the Court's conclusion that the assault statute does not require that the victim perceive the defendant's conduct for that conduct to constitute a "threat." The Court's careful and thorough analysis is more than sufficient to support such a holding, and the conclusion is sufficient to dispose of this case. Having laid the groundwork for the conclusion, the Court gains nothing by stopping just short of making it a holding.

Nevertheless, I find some of the Court's discussion on this question problematic. The issue before us is whether a victim must perceive conduct in order for that conduct to be a threat. A couple of issues not before us are whether the victim must be subjectively frightened for the act to be a threat, and whether (if fright is required) "threat" is judged subjectively or by a "reasonable person" standard. Some of the examples the Court uses and cases to which the Court cites are pertinent only to the latter questions.

I also do not find the *Fatal Attraction* example and the threatening-note example to be helpful. In both of those cases, there is a threat to harm the victim by an act in the future. In the present case, there was no threat to act in the future-the threat and the conduct were one and the same.

---

43. For example, in the context of a terroristic threat, a threatening note left on a victim's doorstep cannot be received at the instant it is written, nor at the instant it is left. However, the victim, arriving home moments (or even hours) later, still receives the communicated threat as if the words came directly from the actor's mouth. Or some may recall the scene in *Fatal Attraction,* when Glen Close left the pet rabbit in a pot of boiling water for her lover's wife to find. Nobody saw her as she dropped the bunny into the boiling water. No one knew how long it sat on the stove. Yet the unsuspecting wife certainly received the threat when she came home to find the bubbling pot. In neither the context of a terroristic threat or of an assault by threat is the victim required to perceive the threat at the very instant of the defendant's threatening act.

44. The record is unclear as to precisely how much time passed between the moment appellant shot at Ms. Tunnell and the time that she reached the laundromat. However, the evidence does show that Ms. Tunnell was driving down the road that the laundromat was located on when appellant fired the shots.

45. This is evidenced by her testimony:

Q. [W]hat did you do after you noticed the bullet hole in the truck?
A. I called the police.
Q. How did you feel?
A. I was shocked. I was upset. I was scared. I was in disbelief. I really could not believe that he did that.
. . .
Q. How did you take the actions of the defendant towards you? How did you take that?
A. I took them as intent to harm me. As— I really didn't know if he intended to kill me or what the deal was.

Given the many aspects of the "threat" issue, perhaps it would be better simply to hold, as the Court almost does, that a threat need not be perceived in order to be a threat.