**Opinion issued August 22, 2013**



In The

# Court of Appeals

For The

# First District of Texas

——————————

## NO. 01-12-00455-CR, 01-12-00456-CR

———————————

**DARYL LEE BEESON, Appellant**

**V.**

**STATE OF TEXAS, Appellee**

**On Appeal from the 221st District Court
Montgomery County, Texas
Trial Court Case No. 11-04-04686-CR (Counts I and II)**

## MEMORANDUM OPINION

A jury found appellant, Daryl Lee Beeson, guilty of two separate offenses of

aggravated sexual assault of a child[1] and assessed his punishment for each offense

---

[1]      *See* TEX. PENAL CODE ANN. § § 22.021(a)(1)(B)(i), 22.02(a)(2)(B) (Vernon Supp. 2012).

at confinement for life and a fine of $10,000.[2]  In two issues, appellant contends that the evidence is legally insufficient to support his convictions and the trial court erred in "stacking" the sentences or "running them concurrently."  In his third issue, he invites us to exercise our discretion to address any "unassigned error."

We affirm.

## Background

The complainant testified that on January 23, 2011, when she was fifteen years old, she decided to run away from home after her father and brother had had a fight.  She described a girl named "Emily," who exists "inside her head," whom the complainant has known "forever," and who talks to the complainant and tells her what to do.  Emily "told" the complainant to leave the house that night.  After her father went to bed, the complainant packed a bag and left the house on foot.  After she had walked for about forty-five minutes, appellant drove up in his car and offered her a ride.  Although reluctant at first, the complainant got into the car because appellant told her that he "believed in religion and Christianity" and she saw a religious statue and "gospel magazines" in his car.

Appellant took the complainant to his trailer, showed her around, and was "nice" to her.  He then told her to "stay" in the trailer, and he left for "a while."

---

[2]  This appeal, originally filed in the Ninth Court of Appeals, Beaumont, Texas, was transferred to the First Court of Appeals, Houston, Texas.  *See* TEX. GOV'T CODE ANN. § 73.001 (Vernon 2013).

While he was gone, the complainant "mellowed out." Later, after appellant returned, he told her that he "had a gun" and "would shoot" anyone who "hurt her."

The complainant remembered that she "zoned out" and lay down on appellant's bed on her side. She then heard appellant's voice from behind her as he became "angry" and "rude," saying, "[r]emember, I have a gun." Appellant, who was on the bed behind her, then pulled her pants and panties down, but not off completely. He held down the complainant's wrists, put his legs around hers to hold them down, and sexually assaulted her by putting his penis in her "butt and vagina" more than four times.

The complainant further testified that during the assaults, she cried and screamed. And she was afraid that appellant would hurt her very badly or kill her. She gave up resisting only when she realized that she could not get him off of her. Before she gave up, the complainant was able to push appellant away, and he ejaculated on the back of her leg. She explained that while in appellant's trailer, she did not see a gun, and, at first, she did not believe that he had a gun. Later, however, she did believe that he had a gun because she knew "he could or wouldn't be lying and [she] believed it because he hurt [her]."

On the morning after the assaults, appellant told the complainant to get dressed, drove her to a restaurant, and sped off. She went into the bathroom of the

3

restaurant and asked a woman for help. She explained that she did not want to go home; she just wanted to go somewhere she could "get help."

Montgomery County Sheriff's Office ("MCSO") Deputy G. Fruge testified that on January 24, 2011, he was dispatched to a restaurant for a "welfare check." Upon his arrival, Fruge noted that it appeared that "something traumatic had happened" to the complainant because her hair and clothes looked "disheveled," she spoke very softly, her lower lip was swollen and appeared to have been bleeding, and she had blood on her shirt. Fruge explained that he obtained permission from a supervisor to have a sexual assault exam performed on the complainant, and he called for emergency assistance to transport her to a local hospital. At the hospital, Fruge took pictures of the complainant's injuries, which included the swollen lip and cuts on her arms. Fruge learned from the complainant that the cuts on her arms were self-inflicted.

MCSO Sergeant K. Funderburk, who was assigned to investigate the sexual assaults, testified that on January 27, 2011, he spoke with the complainant at the psychiatric hospital where she was staying. During their interview, the complainant told Funderburk that "[h]e didn't really threaten me. He just said that he had a gun." When Funderburk asked if appellant had said that he had a gun in a threatening manner, the complainant nodded affirmatively, but did not "say the words."

4

Sergeant Funderburk further testified that on April 27, 2011, he interviewed appellant at Funderburk's office. During the interview, appellant told Funderburk that on January 23, 2011, he had seen a girl walking in the rain, picked her up, and took her to his trailer. Initially, he denied having sex with the complainant, but eventually acknowledged having sex with her in his trailer. Appellant described the complainant as "very quiet," "withdrawn," "Plain Jane," and "young." When shown a photograph of the complainant, appellant responded, "Oh man, she is young." Appellant stated that he had not hit or injured the complainant in any way, he was "not violent," and the sex was consensual. And he noted that the complainant did not say anything while they had sex, although, afterward, she might have said that he was "hurting her." The day after they had had sex, when the complainant was getting dressed, appellant offered to drive her to a location of her choice. When the complainant did not say where she wanted to go, appellant took her to a restaurant and dropped her off.

Pennie Stanley, a forensic interviewer, testified that on May 5, 2011, she interviewed the complainant at Children's Safe Harbor, which provides counseling and interviews for children who are involved in abuse allegations. Stanley explained that sometimes children who have been sexually abused by strangers are unable to recount certain details because of the trauma associated with the memories. When Stanley interviewed the complainant, the volume of the

5

complainant's voice was "very low," and she "did not move" in her chair. The complainant explained to Stanley that she had run away, and a man in a car picked her up in a car and took her to a trailer. The man then left her in the trailer, came back, took down her pants, and "put his penis in her butt and vagina." The man held the complainant down, and she tried to kick him off. The complainant initially told Stanley that her attacker did not threaten her. Stanley then took a break from the interview, and when she returned, she asked the complainant about her statements to Sergeant Funderburk concerning appellant's gun. The complainant then told Stanley that although she never saw it, appellant told her that he possessed a gun.

## Sufficiency of the Evidence

In his first issue, appellant argues that the evidence is legally insufficient to support his convictions for aggravated sexual assault of a child because there is "insufficient evidence" to show that he "threatened the complainant with death or serious injury as alleged in the indictment."

We review the legal sufficiency of the evidence by considering all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007) (citing *Jackson v. Virginia*, 443 U.S. 307, 318–19, 99 S. Ct. 2781, 2788–89

6

(1979)). Evidence is legally insufficient when the "only proper verdict" is acquittal. *See Tibbs v. Florida*, 457 U.S. 31, 42, 102 S. Ct. 2211, 2218 (1982). Our role is that of a due process safeguard, ensuring only the rationality of the trier of fact's finding of the essential elements of the offense beyond a reasonable doubt. *See Moreno v. State*, 755 S.W.2d 866, 867 (Tex. Crim. App. 1988). In doing so, we give deference to the responsibility of the fact finder to fairly resolve conflicts in testimony, to weigh evidence, and to draw reasonable inferences from the facts. *See Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). We defer to the fact finder's resolution of conflicting evidence unless the resolution is not rational. *See id.* However, our duty requires us to "ensure that the evidence presented actually supports a conclusion that the defendant committed" the criminal offense of which he is accused. *Williams*, 235 S.W.3d at 750.

A person commits the offense of aggravated sexual assault of a child if the person intentionally or knowingly "causes the penetration of the anus or sexual organ of a child by any means," and, "by acts or words occurring in the presence" of the complainant, "threatens to cause" "death, serious bodily injury, or kidnapping of any person." TEX. PENAL CODE ANN. § § 22.021(a)(1)(B)(i), (a)(2)(A)(iii) (Vernon Supp. 2012).

Appellant asserts that the evidence is insufficient to show either that the complainant actually "felt threatened" simply because he "told her that he had a

gun" or he intended the statement "remember, I have a gun" as a threat to the complainant of "serious bodily injury or death."

The word "threaten" is not defined in the Texas Penal Code. *See Olivas v. State*, 203 S.W.3d 341, 345 (Tex. Crim. App. 2006). In determining the meaning of the word "threaten" in a case involving the offense of assault by threat, the Texas Court of Criminal Appeals examined the definitions found in Webster's Dictionary and Black's Law Dictionary. *Id.* The Court noted that Webster's defines "threaten" as follows:

1. to declare an intention of hurting or punishing; to make threats against;
2. to be a menacing indication of (something dangerous, evil, etc.); as the clouds threaten rain or a storm;
3. to express intention to inflict (injury, retaliation, etc.);
4. to be a source of danger, harm, etc. to.

*Id.* (quoting Noah Webster, Webster's New Twentieth Century Dictionary of the English Language Unabridged 1901 (2d ed.1983)). The Court further noted that Black's defines "threat" as: "A communicated intent to inflict harm or loss on another or on another's property. . . ." *Id.* (quoting BLACK'S LAW DICTIONARY 1203 (7th ed. 2000)). For legal purposes, threats are not limited to verbal statements, but may also be communicated by action or conduct. *Dobbins v. State*, 228 S.W.3d 761, 766 (Tex. App.—Houston [14th Dist.] 2007, pet. dism'd) (citing *McGowan v. State*, 664 S.W.2d 355, 357 (Tex. Crim. App. 1984)).

8

When deciding criminal liability for aggravated sexual assault, a jury may consider a defendant's overall conduct and infer from the totality of the circumstances whether that conduct placed the complainant in fear of death or serious bodily injury. *Tinker v. State*, 148 S.W.3d 666, 671 (Tex. App.—Houston [14th Dist.] 2004, no pet.); *Lindsey v. State*, 672 S.W.2d 892, 894 (Tex. App.—Dallas 1984, pet. ref'd); *see also Dacquisto v. State*, 721 S.W.2d 603, 604–05 (Tex. App.—Amarillo 1986, pet. ref'd) (affirming aggravated sexual assault conviction where defendant did not verbally threaten complainant's life). When examining the evidence in aggravated sexual assault cases, "we review the evidence overall and determine whether the 'acts, words or deeds' of the actor were sufficient to place a reasonable person in complainant's circumstances in fear of death or serious bodily injury." *Tinker*, 148 S.W.3d at 671 (citing *Dodson v. State*, 699 S.W.2d 251, 254 (Tex. App.—Tyler 1985, no pet.)).

Here, the complainant testified that appellant told her that he "had a gun." Appellant first said this in a manner that she did not initially interpret as a "threat" because he suggested that he would use the gun to "protect" her by shooting anyone who tried to hurt her. Later, in a "rude" and "angry" voice, appellant "reminded" the complainant that he had a gun as he pulled down her pants and panties, held down her wrists and legs, and sexually assaulted her. She noted that although she initially did not believe that appellant had a gun, she later believed it

9

because she "knew" "he could or wouldn't be lying" and "he hurt [her]." And, the complainant explained that she cried and screamed during the assault and was afraid that he would hurt her very badly or kill her. There is also evidence that during the assault, appellant bit the complainant, causing her lip to bleed.

During their interview, the complainant told Sergeant Funderburk that appellant "didn't really threaten me. He just said that he had a gun." When Funderburk asked if appellant had said that he had a gun in a threatening manner, the complainant nodded affirmatively, although she did not say the words herself.

During their interview several months after the sexual assaults, the complainant initially told Pennie Stanley that appellant did not threaten her. However, Stanley noted that after taking a break from the interview, she asked the complainant about her statements to Sergeant Funderburk about appellant's gun. The complainant then told Stanley that although she never saw it, appellant told her that he "had a gun." And the complainant testified that she did not remember "shaking her head 'no,'" when Stanley asked her if appellant had threatened her.

In addition to her testimony about appellant's gun, the complainant testified that she was afraid that he would hurt her very badly or kill her. The jury was also presented with medical evidence that the complainant suffered various injuries from the sexual assaults. The injuries included a bite to her lip, which caused swelling and bleeding, and several tears around her anus. Such injuries are

10

consistent with painful, forceful sexual activity.  *See Tinker*, 148 S.W.3d at 669–70.

Jurors are the exclusive judges of the facts, the credibility of the witnesses, and the weight to be given witness testimony.  *Penagraph v. State*, 623 S.W.2d 341, 343 (Tex. Crim. App. 1981); *Jaggers v. State*, 125 S.W.3d 661, 672 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd).  As such, they may choose to believe or disbelieve any part of a witness's testimony.  *See Davis v. State*, 177 S.W.3d 355, 359 (Tex. App.—Houston [1st Dist.] 2005, no pet.).  Likewise, "reconciliation of conflicts in the evidence is within the exclusive province of the jury."  *Wyatt v. State*, 23 S.W.3d 18, 30 (Tex. Crim. App. 2000) (quoting *Losada v. State*, 721 S.W.2d 305, 309 (Tex. Crim. App. 1986)).  A jury may choose to believe certain testimony and disbelieve other testimony.  *Id*.  If there is enough credible testimony to support a defendant's conviction, the conviction will stand.  *Id*.

Viewing all the evidence in the light most favorable to the jury's verdict, we conclude that a rational trier of fact could have found that appellant threatened the complainant with death or serious bodily injury during the sexual assaults.  From the evidence presented, the jury could have reasonably found that appellant's "acts, words, or deeds" were sufficient to place a reasonable person in the complainant's circumstances in fear of death or serious bodily injury.  Accordingly, we hold that

11

the evidence is legally sufficient to support appellant's convictions for the offenses of aggravated sexual assault of a child.

We overrule appellant's first issue.

**Sentencing**

In his second issue, appellant argues that the trial court erred in "stacking" his sentences or "running them concurrently" because neither the trial court's judgment nor the reporter's record state which sentence is to run first. The jury assessed appellant's punishment at confinement for life and a fine of $10,000 for each separate offense.

A trial court may cumulate sentences for certain offenses arising out of the same criminal episode and prosecuted in a single criminal trial. *See* TEX. PENAL CODE ANN. § 3.03 (Vernon Supp. 2012). Sexual assault of a child, if the complainant is under the age of seventeen when the offense is committed, is an offense for which a trial court may cumulate sentences. *See id.* § 3.03 (b)(2)(A). And the decision to impose concurrent or cumulative sentences is within the discretion of the trial court. TEX. CODE CRIM. PROC. ANN. art. 42.08(a) (Vernon Supp. 2012).

The trial court, on March 29, 2012, signed a judgment concerning "count one" of the indictment and a judgment concerning "count two," with both judgments stating that "this sentence shall run consecutively." Appellant argues

12

that the judgments constitute "improper cumulation orders" and "void" sentences because the State did not request, and the trial court did not make, "a determination of which sentence is to begin after the completion of the other."

However, on June 14, 2012, the trial court, in its signed judgment nunc pro tunc related to count two, stated that its sentence in count two is to run consecutively with its sentence in count one. A trial court may correct a cumulation order nunc pro tunc to add details inadvertently omitted from its first cumulation order. *See Williams v. State*, 675 S.W.2d 754, 765 n.6 (Tex. Crim. App. 1984).

A cumulation order must be specific enough that prison authorities know how long to hold a prisoner. *Stokes v. State*, 688 S.W.2d 539, 540 (Tex. Crim. App. 1985). To be valid, a cumulation order must identify the: (1) cause number of the prior conviction; (2) name of the trial court of the prior conviction; (3) date of the prior conviction; (4) term of years of the prior conviction, and (5) nature of the prior conviction. *Id*. And the cumulation order should be sufficiently clear so that it may be understood without having to refer to other evidence. *Id*.

Here, the trial court orally pronounced that the sentences for count one and count two are to run consecutively, and it granted the State's motion for consecutive sentences, stating to appellant "you are going to have one life sentence stacked on the other life sentence." The judgments entered for each count also

13

reflect this. However, as set forth above, the trial court, in neither the oral pronouncement nor its judgments, stated which sentence appellant would first serve. The judgment nunc pro tunc entered on count two corrected that omission, showing that appellant is to serve the sentence on count two consecutively to the sentence for count one. In other words, appellant is to serve the sentence in count one first, and the sentence in count two is to follow. Because a trial court may correct a cumulation order nunc pro tunc to add descriptive details, we conclude that the trial court did not err in cumulating the sentences. *See Williams*, 675 S.W.2d at 765 n. 6.

Together, the trial court's judgments meet the specificity requirements for validity under *Stokes*. They provide the cause number, name of the trial court, date, term of years, and nature of the prior conviction, *i.e.*, "Count One." To the extent that the trial court's judgment nunc pro tunc is not clear, we modify it to state that appellant's sentence for count two in trial court cause number 11-04-04686-CR is to commence at the completion of appellant's sentence for count one in trial court cause number 11-04-04684-CR. *See Cobb v. State*, 95 S.W.3d 664, 668 (Tex. App.—Houston [1st Dist.] 2002, no pet.) (appellate court has the power to correct a trial court's written judgment if the appellate court has the information necessary to do so).

We overrule appellant's second issue.

14

**Unassigned Error**

In his third issue, appellant asks us to consider any issue that "trial counsel and/or appellate counsel have failed to properly object [to] or raise . . . that is clearly erroneous and harmful error." A court of appeals may, in its discretion, address unassigned error. *See Wright v. State*, 981 S.W.2d 197, 199 n.2 (Tex. Crim. App. 1998). However, the Texas Court of Criminal Appeals has defined such unassigned error as "a claim that was preserved in the trial below but was not raised on appeal," and it has noted that "many, if not most, of the types of error that would prompt *sua sponte* appellate attention need not be assigned because the error involved constitutes an obvious violation of established rules." *See Pena v. State*, 191 S.W.3d 133, 136 (Tex. Crim. App. 2006). The court has also emphasized that a conviction, even if wrongly obtained, must be affirmed when error is not preserved below as "it violates 'ordinary notions of procedural default' for a court of appeals to reverse a trial court's decision on a legal theory that the complaining party did not present to the trial court." *State v. Bailey*, 201 S.W.3d 739, 743 (Tex. Crim. App. 2006) (citing *Hailey v. State*, 87 S.W.3d 118, 122 (Tex. Crim. App. 2002)); *see also* TEX. R. APP. P. 33.1. Exceptions to that rule exist, as an appellate court may address some issues raised for the first time on appeal. *See Gonzalez v. State*, 8 S.W.3d 640, 642–43 (Tex. Crim. App. 2000). However, this

case presents no such issue and we decline to exercise our discretion to address any unassigned error.

We overrule appellant's third issue.

## Conclusion

We affirm the judgments of the trial court.

Terry Jennings
Justice

Panel consists of Justices Jennings, Bland, and Massengale.

Do not publish.   TEX. R. APP. P. 47.2(b).

16