

# COURT OF APPEALS
**SECOND DISTRICT OF TEXAS**
**FORT WORTH**

## NOS. 02-10-00127-CR
## 02-10-00128-CR

JASON MICHAEL SORRELLS                                    APPELLANT

V.

THE STATE OF TEXAS                                            STATE

----------

## FROM THE 355TH DISTRICT COURT OF HOOD COUNTY

----------

## MEMORANDUM OPINION[1]

----------

### Introduction

Appellant Jason Michael Sorrells asks us to reverse his convictions for unlawful possession of a firearm, evading arrest, deadly conduct, and nine counts of aggravated assault of peace officers, claiming that the evidence is insufficient and that his trial counsel was ineffective. We affirm.

---
[1]*See* Tex. R. App. P. 47.4.

**Background Facts and Procedural History**

Appellant moved out of Lesley Arterburn's trailer house on the outskirts of Granbury sometime around Thanksgiving 2008. One night just before Christmas, he went back to retrieve some of his belongings. Friends were visiting Lesley that night, and one of them, Darla Jorden, walked outside to meet Appellant when he arrived. Darla asked him what he wanted; he said his tent; she gathered it from the porch, tossed it into the back of his pickup truck, and asked him to leave. He refused, claiming there still were more things he wanted. Darla replied that she did not see anything else, repeated her request that he leave, and suggested that he could deal with the other things later. Appellant got upset, which resulted in his yelling, swearing, and revving his engine.

Lesley and her other guests came out of the house. Randea Cowen, who had known Appellant for a couple of years, thought she could persuade him to come back for the rest of his things some other time. While she talked to him in the doorway of his truck, Lesley walked up behind her. Appellant and Lesley started arguing, and their argument escalated to Appellant's reaching past Randea and grabbing Lesley by the neck.

John Ahnson stepped in at that point and engaged Appellant in a fist fight. The two tussled in the grass, on the concrete, and inside the bed of Appellant's pickup truck before Appellant retreated behind the steering wheel. He gunned the motor and plowed through the yard, swerving at the others as they dodged

2

and scattered. After he left, Lesley and her guests retired to the house and called the sheriff's department.

Appellant stopped briefly at the trailer park where he was staying and then went to Curtis Proctor's house. He asked Curtis if he could borrow a gun to take "deer hunting" in the morning. Curtis lent him a rifle with a scope and four rounds of .30–06 ammunition. Appellant took the rifle and hid in the woods across from Lesley's home.

Peering through the rifle scope from his hiding place, Appellant watched Patrol Sergeant Michelle Berry and Deputy Toby Fries arrive and take statements from Lesley and her friends. The deputies also photographed Lesley's and John's scrapes and bruises.

When the deputies left, Beverly, who had ridden with Randea, went outside and waited in Randea's car parked beside the trailer.

Randea, Lesley, Darla, and Billy Wiley were in the kitchen laughing and joking with John, who sat facing them on the living room couch. Appellant slipped into the trailer through the back door, crept into the living room, and lowered the rifle to the back of John's head, taunting, "You think this is f---ing funny? I'll show you how funny it is."

Lesley and Darla grabbed their cell phones. Lesley dialed 911 on hers, handed it to Billy, and walked toward Appellant while he tried to chamber a round. The rifle jammed. Shaking the rifle, Appellant backed toward the front door. When he reached the door, Lesley shoved him through. Appellant pushed

3

back to get inside, but Lesley and Darla held the door and locked it. Randea ran to lock the back door. Lesley slid to the floor and sat there while Billy and Darla spoke with the 911 operator.

Appellant climbed off the porch, ran several steps alongside the trailer, still shaking the rifle. He finally dislodged the jammed cartridge, which dropped to the grass in the front yard. Appellant chambered another round, aimed at the trailer, and opened fire.

The first bullet pierced the wall so close to Darla that she could smell it. She dropped to the floor and started crawling to the back of the trailer. Appellant fired two more shots. By the third one, Darla's ears were ringing badly, but she managed to stay on the line with the 911 operator. As her friends scrambled for cover, Lesley remained planted by the front door.

When he stopped shooting, Appellant ran into the dark toward the road. Bullets had punched eight entry holes in the front of the trailer and nine exit holes out the back, leaving shattered windows and Christmas ornaments, bent and broken blinds, and a perforated couch in between.

The 911 operator dispatched Sergeant Berry and Deputy Fries back to Lesley's trailer to investigate the "shots fired call." They were joined by Sergeants James Cromwell and William Watt and by Deputies Brad Duckett and William Drake.

Granbury Police Sergeant Cliff Clemons was on patrol when he heard 911 dispatch the deputies. He drove to the city limits and waited near the back

4

entrance of Lesley's subdivision. After a few minutes, he saw Appellant's truck run the stop sign and go south on Highway 51 "at a fairly good pace." Within a few minutes, Clemons had closed the gap. Appellant then made a U-turn and drove toward Clemons's car, causing the officer to swerve into the ditch.

As Appellant sped northbound up 51, Officer Dirk Sain, responding to Clemons's call for backup, approached southbound. Sain narrowly missed a collision with the pickup as it veered into his lane and forced him off the road.

Having learned that city police officers had narrowly missed a collision outside city limits, Texas Department of Public Safety (DPS) Trooper Nick Duecker drove southbound on 51 to investigate. He saw Appellant followed by patrol cars with lights flashing turn in front of him east onto Neri Road and race toward Highway 144.

When the deputies reached Lesley's house, they heard over the radio that city units were chasing the suspect to 144. After determining that no one at the trailer had been injured, they left to assist in the pursuit.

Appellant reached 144, turned south, and started rocking the truck back and forth, dislodging furniture and a spare tire from the bed. The pursuing officers drove around the obstacles and chased Appellant into the Nubbin Ridge RV Park, where his truck skidded to a stop in front of a large tree between two trailers.

Appellant climbed out of the truck with the rifle, and pacing nervously, pointed the rifle at officers in several patrol cars as they converged around the

pickup. He tossed the rifle into the bed, jumped into the bed, shouted for the officers to shoot him, picked up the rifle, cocked it, lifted it to his shoulder, and took aim. As the officers formed a semi-perimeter, some of them aimed weapons at Appellant. None fired, however, as it became apparent that at least one trailer within the line of fire was occupied. After a brief standoff, Appellant surrendered and was arrested.

The grand jury returned two indictments charging Appellant with evading arrest, unlawful possession of a firearm, three counts of deadly conduct, and eleven counts of aggravated assault, including nine counts of aggravated assault against peace officers.

Appellant moved for and was granted funds to hire a psychiatrist to determine Appellant's competency to stand trial and sanity at the time of the offense. The psychiatrist, Dr. Stephen Mark, examined Appellant, interviewed Appellant's family, reviewed his medical records, and determined that although Appellant was suffering the effects of grief and alcohol at the time of the offense, and that he had displayed faulty judgment, he was both competent to stand trial and legally sane at the time of the offense.

The jury found Appellant not guilty on one count of aggravated assault and guilty of evading arrest, unlawful possession of a firearm, one count of deadly conduct, and all nine counts of aggravated assault on peace officers.[2] Appellant

---

[2]The trial court granted the State's motion to dismiss two counts of deadly conduct and one count of aggravated assault.

pleaded true to enhancement paragraphs alleging prior felonies, and the trial court set his punishment at two years' confinement in the state jail for evading arrest, two twenty-year prison sentences for deadly conduct and unlawful possession of a firearm, respectively, and nine life sentences for aggravated assault. All sentences were ordered to run concurrently.

Appellant filed and presented a motion for new trial and was granted a hearing, but offered no evidence. He argued only that the verdicts should be set aside as contrary to the law and the evidence, and that the trial court had discretion to grant a new trial in the interest of justice. The motion was denied.

### Sufficiency of the Evidence

In his second and third issues, Appellant claims that the evidence is legally and factually insufficient, respectively, to support the guilty verdicts on the aggravated-assault-against-public-servant counts. Because the court of criminal appeals has eliminated the factual sufficiency standard of review from this state's criminal jurisprudence, and has held that the standard set out by the United States Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979) is the only standard of review that applies to insufficiency-of-the-evidence claims, we overrule Appellant's third issue and consider only the second in determining whether the evidence is sufficient to support the jury's

verdicts. *See Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (overruling *Clewis v. State*, 922 S.W.2d 126 (Tex. Crim. App. 1996)).

A person commits aggravated assault when he commits assault as defined in section 22.01 of the penal code while using or exhibiting a deadly weapon. Tex. Penal Code Ann. § 22.02(c) (West 2011). A person commits assault as defined in section 22.01(a)(2) if he intentionally or knowingly threatens another with imminent bodily injury. *Id.* § 22.01(a)(2). Aggravated assault is a first-degree felony if committed against a person the actor knows is a public servant while the public servant is discharging an official duty. *Id.* § 22.02(b)(2)(B). A peace officer is a public servant. *See Calhoun v. State*, No. 14-09-00936-CR, 2011 WL 398077, at *6 (Tex. App.—Houston [14th Dist.] Feb. 8, 2011, no pet.) (mem. op., not designated for publication). The actor is presumed to have known the assaulted person was a public servant if the person was wearing a distinctive uniform or badge. Tex. Penal Code Ann. § 22.02(c).

Appellant does not contest the sufficiency of the evidence to prove that the officers were peace officers acting in their official capacities as such, that Appellant knew that they were, or that Appellant used or exhibited a deadly weapon, i.e., a firearm. What he does argue is that the evidence is insufficient because the jury was only guessing as opposed to reasonably inferring from the evidence that he intended to threaten the officers because the evidence shows that he only intended to commit "suicide by cop" rather than assault. We disagree.

8

First, we note that Appellant misstates the requisite intent element by asserting that the evidence is insufficient to show that he intended to *assault* the officers. Appellant was found guilty on nine counts of aggravated assault of a public servant as charged in the indictment by intentionally or knowingly *threatening* the public servants with imminent bodily injury. *See id*. § 22.01(a)(2) (West 2011). So whether or not Appellant intended to assault the officers, the requisite culpable mental state is to intentionally or knowingly threaten.

Second, and more importantly, Appellant's argument assumes that intent to threaten and intent to provoke assisted suicide are mutually exclusive. Logically, they are not. Assuming for the sake of argument that Appellant's goal was to provoke the officers into killing him. In order to achieve that goal, a credible threat to the officers or to a third party would be required. Without a credible threat to justify the officers' use of deadly force, it is unlikely that the officers would use it. In other words, Appellant's intent to commit suicide by cop would remain unrealized unless Appellant intentionally or knowingly threatened the officers.

Furthermore, viewed in the light most favorable to the verdicts, the evidence is sufficient to support a reasonable jury's belief beyond a reasonable doubt that Appellant intentionally or knowingly threatened all nine officers. Each officer specifically testified that Appellant pointed the rifle at him. Before that, the jury had already heard evidence that Appellant had grabbed a woman by the throat, tried to mow down several people with his pickup truck in her front yard,

9

lied to a friend to get a high-powered rifle that he used to shoot holes in a trailer-full of people, led police on a high-speed chase in which he ran two patrol cars off the road by driving his pickup truck directly toward them, and violently rocked his pickup truck back and forth until it disgorged a large piece of furniture and a spare tire from its bed, which pursuing officers had to maneuver around. When he finally ended up cornered in the RV park, Appellant disregarded officers' repeated commands to disarm himself, shouted for them to shoot him because he was "going to prison anyway," racked his weapon, and drew a bead on the officers. We hold that the evidence is sufficient to show that Appellant intentionally or knowingly threatened the officers. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Olivas v. State*, 203 S.W.3d 341, 349 (Tex. Crim. App. 2006); *Delay v. State*, No. 02-05-00132-CR, 2006 WL 820391, at *3 (Tex. App.—Fort Worth Mar. 30, 2006, no pet.) (mem. op., not designated for publication). Accordingly, we overrule Appellant's second issue.

## Effective Assistance of Counsel

In his first issue, Appellant contends that his trial attorneys (Counsel) made a number of harmful mistakes that deprived him of his constitutional right to effective assistance of counsel. To prevail on this point, Appellant must show by a preponderance of the evidence that Counsel's representation fell below the standard of prevailing professional norms and that there is a reasonable probability that, but for Counsel's deficiency, the result of the trial would have been different. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052,

10

2064 (1984); *Salinas v. State*, 163 S.W.3d 734, 740 (Tex. Crim. App. 2005); *Mallett v. State*, 65 S.W.3d 59, 62–63 (Tex. Crim. App. 2001); *Thompson v. State*, 9 S.W.3d 808, 812 (Tex. Crim. App. 1999); *Hernandez v. State*, 988 S.W.2d 770, 770 (Tex. Crim. App. 1999).

In evaluating the effectiveness of Counsel under the first prong, we look to the totality of the representation and the particular circumstances of the case. *Thompson*, 9 S.W.3d at 813. The issue is whether Counsel's assistance was reasonable under all the circumstances and prevailing professional norms at the time of the alleged error. *See Strickland*, 466 U.S. at 688–89, 104 S. Ct. at 2065. Review of Counsel's representation is highly deferential, and we indulge a strong presumption that Counsel's conduct fell within a wide range of reasonable representation. *Salinas*, 163 S.W.3d at 740; *Mallett*, 65 S.W.3d at 63.

Rarely does the record on direct appeal position an appellate court to fairly evaluate the merits of an ineffective assistance claim. *Salinas*, 163 S.W.3d at 740; *Thompson*, 9 S.W.3d at 813–14. "In the majority of cases, the record on direct appeal is undeveloped and cannot adequately reflect the motives behind trial counsel's actions." *Salinas*, 163 S.W.3d at 740 (quoting *Mallett*, 65 S.W.3d at 63). To overcome the presumption of reasonable professional assistance, "any allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness." *Id.* (quoting *Thompson*, 9 S.W.3d at 813). It is not appropriate for us to simply infer ineffective assistance based upon unclear portions of the record. *Mata v. State*,

11

226 S.W.3d 425, 432 (Tex. Crim. App. 2007). Further, we are very reluctant to denounce a lawyer as ineffective absent an opportunity for the lawyer to explain his or her actions on the record. *See Rylander v. State*, 101 S.W.3d 107, 111 (Tex. Crim. App. 2003); *Goodspeed v. State*, 187 S.W.3d 390, 391 (Tex. Crim. App. 2005) (holding that inquiry into counsel's conduct—failure to ask any questions during voir dire and exercise of peremptory challenges on jurors who had already been excused—was needed to determine whether performance was deficient).

For these reasons, the court of criminal appeals and this court have often stated that ineffective assistance claims are usually best addressed by a post-conviction writ of habeas corpus. *See Ex parte White*, 160 S.W.3d 46, 49 n.1 (Tex. Crim. App. 2004); *Thompson*, 9 S.W.3d at 814 & n.6; *Ex parte Torres*, 943 S.W.2d 469, 475–76 (Tex. Crim. App. 1997); *Lopez v. State*, 80 S.W.3d 624, 630 (Tex. App.—Fort Worth 2002), *aff'd*, 108 S.W.3d 293 (Tex. Crim. App. 2003); *Ramirez v. State*, No. 02-08-00396-CR, 2009 WL 3490875, at *1 n.4 (Tex. App.—Fort Worth Oct. 29, 2009, no pet.) (mem. op., not designated for publication). The case before us is yet another example where this is true. Through his appellate counsel, Appellant filed and presented to the trial court a motion for new trial and obtained a hearing on the motion. However, at the hearing, which was transcribed on a one-page record, Appellant did not assert that Counsel provided ineffective assistance and did not offer any evidence.

Still, Appellant criticizes Counsel for not taking four specific actions, which he contends all worked to Appellant's detriment at trial. Although Appellant offered no evidence on the issue of Counsel's effectiveness, what is in the record does not support Appellant's claim.

First, Appellant faults Counsel for not filing a notice of intent to seek an insanity defense as well as "other proper pleadings" to ensure that the jury could have heard evidence and expert psychiatric testimony, which he asserts "could and likely would have negated" the intent element required for "all the criminal charges" the State had brought against him. He asserts that Counsel failed to file "any type of notice" of intent to seek an insanity defense but then acknowledges that Counsel requested and that the trial court appointed a psychiatrist to examine Appellant to determine whether he was insane at the time of the alleged offenses. Appellant's "Motion to Appoint Psychiatrist to Assist in the Evaluation, Preparation and Presentation of Defense" urged that a psychiatrist was necessary to enable him to prepare for trial, present favorable evidence, and provide expert opinion evidence "critical to a determination of [his] competency to stand trial and of [his] sanity at the time of the offense." The trial court granted the motion and appointed psychiatrist Dr. Stephen Mark, who examined Appellant and opined that although Appellant certainly had some mental and emotional problems, he was legally sane at the time of the alleged offenses. Still, Appellant argues that Counsel was ineffective for not following statutorily prescribed procedures for admitting evidence supporting an insanity

13

defense and for not objecting to the trial court's order appointing a psychiatrist because it did not set out the elements of the insanity defense as required by the code of criminal procedure.

Dr. Mark's letter, however, implies that he was aware of the legal definition of insanity. Further, it reveals a fairly sophisticated understanding of the distinction between certain mental health issues—such as anxiety, depression, grief and substance abuse—and insanity in the legal sense, while also displaying a recognition that although these issues may not meet the legal definition of insanity, they may be offered to support mitigation of punishment.

Moreover, the facts of the case support the doctor's opinion that Appellant was sane as well as a reasonable conclusion by Counsel that the pursuit of an insanity defense would have been in vain. In order to prevail on an insanity defense, a defendant must show that at the time of the offense, because of severe mental disease or defect, he did not know that his conduct was wrong. Tex. Penal Code Ann. § 8.01(a) (West 2011). The evidence in the record includes several instances of Appellant's displaying his awareness that what he was doing was wrong. For example, he lied to Curtis Proctor about what he wanted a rifle for, he hid in the woods across from Lesley's trailer while the deputies were there, he fled after shooting up the trailer, and he continued fleeing to avoid capture by law enforcement. When cornered, he shouted for the officers to kill him because he was "going to prison anyway," and he finally surrendered

14

by hopping down from the bed of his pickup truck, kneeling to the ground, and then laying face down with his hands behind him.

Given the doctor's opinion, especially in light of the facts of the case, Counsel reasonably could have concluded that Appellant did not have a viable insanity defense and that pursuing one any further than he did would have been futile. We will not declare a lawyer ineffective for declining to pursue a futile trial strategy. *See Mooney v. State*, 817 S.W.2d 693, 698 (Tex. Crim. App. 1991) (holding that counsel was not ineffective for failing to file futile motions); *Kinnamon v. State*, 791 S.W.2d 84, 97 (Tex. Crim. App. 1990) (failure to request lesser included charge not deficient where evidence did not authorize lesser included charge), *overruled on other grounds by Cook v. State*, 884 S.W.2d 485, 491 (Tex. Crim. App. 1994).

Appellant lodges his next two criticisms at Counsel for not objecting to and not seeking a limiting instruction on the admission of State's Exhibit 34, the recorded 911 call from Billy Wiley, one of Lesley's guests on the night of the shooting. Even if we were to assume that State's Exhibit 34 was objectionable for the reasons now suggested by Appellant on appeal, and that Counsel should have objected to it, we fail to see how its exclusion would have affected the outcome of Appellant's trial. Darla Jorden was on the line with the 911 operator at the same time Billy was. Her tape was also admitted in evidence. Appellant does not claim Darla's tape should have been excluded. We have listened to both tapes. Shots are heard on both. In fact, they are actually more clearly

15

heard on Darla's. Further, a number of witnesses testified that Appellant shot at Lesley's trailer while people were in it. Because Appellant does not show how admission of Billy's tape harmed Appellant given that the same or similar evidence was admitted through Darla's, this complaint does not advance his claim that Counsel was ineffective.

Finally, Appellant complains of Counsel's not making various hearsay and speculation objections but fails to demonstrate how these "failures" affected the outcome of his trial. Without a record showing Counsel's reasons for raising or not raising objections during trial, we presume that Counsel's acts were part of a reasonable trial strategy. *See Jackson v. State*, 877 S.W.2d 768, 771 (Tex. Crim. App. 1994). Moreover, given the evidence in the record that Appellant does not contend could have been excluded, we hold that Counsel's not making the objections suggested by Appellant through hindsight would not have affected the outcome. Appellant's first issue is overruled.

**Conclusion**

Having overruled Appellant's issues, we affirm the judgments.

LEE GABRIEL
JUSTICE

PANEL:  WALKER, McCOY, and GABRIEL, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED:  August 31, 2011