ACCEPTED
03-14-00371-CR
6912638
THIRD COURT OF APPEALS
AUSTIN, TEXAS
9/14/2015 2:43:50 PM
JEFFREY D. KYLE
CLERK

No. 03-14-00371-CR

In the
Court of Appeals for the Third District of Texas
at Austin

_____

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
9/14/2015 2:43:50 PM
JEFFREY D. KYLE
Clerk

No. 13-0520-K26
In the 26th Judicial District Court
Williamson County, Texas

_____

JIM JACK THOMPSON
Appellant
v.
THE STATE OF TEXAS
Appellee

_____

STATE'S BRIEF IN RESPONSE

_____

Jana Duty
District Attorney
Williamson County, Texas

John C. Prezas
State Bar No: 24041722
Assistant District Attorney
jprezas@wilco.org

Daniel Sakaida
State Bar No: 24084601
Special Prosecutor
405 Martin Luther King, Box 1
Georgetown, Texas  78626
(512) 943-1234
(512) 943-1255 (fax)

ORAL ARGUMENT REQUESTED

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to Texas Rules of Appellate Procedure 39.1 and 39.7, Appellant has requested oral argument in this case. Therefore, to preserve its right to argue, the State requests oral argument although the State believes that the facts and legal arguments are adequately presented in the briefs and record, and that the decision-making process would not be significantly aided by oral argument.

# TABLE OF CONTENTS

STATEMENT REGARDING ORAL ARGUMENT ..................................... ii

TABLE OF CONTENTS ................................................................. iii

INDEX OF AUTHORITIES ............................................................ iv

STATEMENT OF FACTS ................................................................1

SUMMARY OF THE ARGUMENT ...........................................................8

ARGUMENT....................................................................................8

  I. The evidence is legally sufficient to support Appellant's conviction for Burglary of a Habitation as alleged in paragraph two of the indictment..8

  A. There was legally sufficient evidence for a rational jury to find beyond a reasonable doubt that Appellant intentionally or knowingly made non-consensual entry into the home of the victim. ..................13

  B. There was legally sufficient evidence for a rational jury to find beyond a reasonable doubt that Appellant injured the victim while Appellant was in the course of committing a crime. .........................16

  C. There was legally sufficient evidence for a rational jury to find beyond a reasonable doubt that Appellant assaulted the victim with the relevant mens rea....................................................................22

    i. Appellant intentionally, knowingly, or recklessly caused injury to the victim. ...............................................................................23

    ii. Appellant intentionally or knowingly threatened the victim or put her in fear of imminent bodily injury or death. ..........................29

PRAYER........................................................................................32

CERTIFICATE OF COMPLIANCE ..........................................................33

CERTIFICATE OF SERVICE.................................................................33

## INDEX OF AUTHORITIES

### CASES

*Aguilar v. State*, 468 S.W.2d 75, 77 (Tex. Crim. App. 1971) -----------------------11

*Bustamante v. State*, 106 S.W.3d 738, 740 (Tex. Crim. App. 2003) ------- 14, 19, 24

*Chambers v. State*, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991) -----------------10

*Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007) --------------------- 9

*Cooper v. State*, 67 S.W.3d 221, 224 (Tex. Crim. App. 2002) --------------20, 21, 24

*Davis v. State*, 177 S.W.3d 355, 358-59 (Tex. App.—Houston [1st Dist.] 2005, no pet.)---------------------------------------------------------------------------------------11

*Farris v. State*, 819 S.W.2d 490, 495 (Tex. Crim. App. 1990)----------------------- 9

*Garrett v. State*, 851 S.W.2d 853, 857 (Tex. Crim. App.1993) ---------------------- 9

*Jackson v. State*, 160 S.W.3d 568, 574-75 (Tex. Crim. App. 2005)--- 11, 12, 26, 27

*Jackson v. Virginia*, 443 U.S. 307, 319 (1979)---------------------------------------- 9

*King v. State*, 895 S.W.2d 701, 703 (Tex. Crim. App.1995) -----------------------10

*Losada v. State*, 721 S.W.2d 305, 309 (Tex. Crim. App. 1986)--------------------9, 31

*Matson v. State*, 819 S.W.2d 839, 8436 (Tex. Crim. App. 1991) -------------------- 9

*Mays v. State*, 318 S.W.3d 368, 381 (Tex. Crim. App. 2010) -----------------------11

*Muniz v. State*, 851 S.W.2d 238, 246 (Tex. Crim. App.1993)-----------------------10

*Olivas v. State*, 203 S.W.3d 341, 346-47 (Tex. Crim. App. 2006)-------------- 33, 34

*Ruffin v. State*, 270 S.W.3d 586, 588 (Tex. Crim. App. 2008) ----------------------12

*Salazar v. State*, 284 S.W.3d 874, 877-78 (Tex. Crim. App. 2009) --------13, 16, 18

*Sorrells v. State*, 343 S.W.3d 152, 156 (Tex. Crim. App. 2011). -------------- passim

*Sweed v. State*, 351 S.W.3d 63, 69 n.5 (Tex. Crim. App. 2011) --------------------14

*Wolfe v. State*, 917 S.W.2d 270, 275 (Tex. Crim. App. 1996)-----------------------14

*Young v. State*, 283 S.W.3d 854, 862 (Tex. Crim. App. 2009)--------------13, 19, 24

### STATUTES

Tex. Penal Code § 31.01(2)(A)------------------------------------------------------------- 13

Tex. Penal Code § 31.03------------------------------------------------------------------- 12

Tex. Penal Code Ann. § 1.07(a)(8)------------------------------------------------------25

Tex. Penal Code Ann. § 29.01------------------------------------------------------- 12, 17

Tex. Penal Code Ann. § 29.02-------------------------------------------------------11, 22, 31

Tex. Penal Code Ann. § 30.02(a)(3) ---------------------------------------------- 11, 22

## OTHER AUTHORITIES

Black's Law Dictionary 751 (7th ed. 1999) -------------------------------------------- 12

TO THE HONORABLE COURT OF APPEALS:

## STATEMENT OF FACTS

The state wishes to clarify the following facts to supplement those addressed in Appellant's brief.

On March 15, 2013, Melinda Cortez, an assistant manager at Payless Shoe Store on Palm Valley street in Round Rock, Texas observed Appellant walk into that store, and enter the employee-only area at the back of the store. R.R. vol. 9 p. 54-56. Appellant was wearing a black shirt with the word "Staff" across the back. R.R. vol. 9 p. 53. He then proceeded to break into a locker and scatter the contents of Ms. Cortez's purse, taking her wallet. R.R. vol. 9 p. 56. When Ms. Cortez confronted Appellant in the store after he left the back room, he immediately denied being in the employee-only area, but eventually relented, claiming he had been looking for a bathroom. *Id.* Ms. Cortez proceeded to check the employee-only area, and discovered her purse's contents scattered about. *Id.* Appellant then ran for the front of the store, attempting to flee, and pushed Stevie Lamb—a customer—out of the way, causing her to fall on the counter. R.R. vol. 9 p. 80. At trial, Appellant's expert witness, Dr. Robert E. Cantu, testified that in his expert opinion, Appellant understood what he was doing at Payless Shoe Store, that it was wrong, and did so intentionally. R.R. vol. 11 p. 88.

1

After fleeing the store, Appellant jumped into the passenger seat of an occupied truck parked in front of the store. R.R. vol. 9 p 56. When Ms. Cortez yelled for the driver of the truck to not give Appellant a ride, he jumped out of the cab, and then jumped into the bed of the truck. R.R. vol. 9 pp. 58-59. Appellant then fled the scene, running into a nearby subdivision. R.R. vol. 9 pp. 62.

Once in that subdivision, Appellant intentionally—as he described his actions to Dr. Cantu—"picked a house at random, ran in the backyard and kicked in the back door." R.R. vol. 11 pp. 90-91. That home, 1475 Rainbow Parke, in Round Rock, Texas belonged to Shannon Francis. R.R. vol. 9 p. 108. Ms. Francis testified that she discovered new cracks in her back door, indicating a forceful entry. R.R. vol. 9 p. 137; R.R. vol. 13 State's Exhibits 54 and 55 (entered photographs illustrating damage to the back doors). Damage to the back door was confirmed on cross examination. R.R. vol. 9 p. 154-55. Dr. Robert E. Cantu, testified that Appellant told him "I just kicked down the first door that I came to." R.R. vol. 11 p. 61. Dr. Cantu testified that in his expert opinion, Appellant intentionally entered Ms. Francis' home. R.R. vol. 11 p. 92.

Once inside, Appellant began searching for items to steal. Ms. Francis testified that Appellant helped himself to a Fresca from her kitchen, and began rummaging through her bedroom. R.R. vol. 9 p. 134, 155. In the bedroom,

2

Appellant removed a pillowcase from a pillow on the bed and used it as a bag to hold Ms. Francis' laptop, some change, and a watch. R.R. vol. 9 p. 134-135. Ms. Francis also noted that one of her purses had been emptied onto the bed, and that an iPod had been knocked off one of her nightstands. *Id.* Further, a camera and Sony PSP from Ms. Francis' house was located in Ms. Francis' significant other's backpack, the same backpack she observed Appellant carry and put in Ms. Francis' car during his attempt to steal said car and prior to fleeing from the police. R.R. vol. 9 p. 136. Again, Dr. Cantu testified at trial that in his expert opinion, Appellant intentionally began looking for and collecting items to steal from Ms. Francis' home. R.R. vol. 11 p 92.

It was at that point that Ms. Francis returned home, on her lunch break from work. R.R. vol. 9 p.p. 106, 108. Ms. Francis parked her vehicle in her driveway, and entered the garage, her Louis Vuitton purse held in the crook of her right arm. R.R. vol. 9 p.p. 109, 111. As Ms. Francis entered her home, she observed Appellant lying on the floor in her bedroom, on his back, and without a shirt on. R.R. vol. 9 p.p. 112, 117-18. Appellant did not at first respond, but after Ms. Francis asked "Who are you?" he mumbled some names, and indicated that those individuals had told him that he could "crash" at the house during South by Southwest. R.R. vol. 9 p. 119. Dr. Cantu classified Appellant's statements as

3

"nonsensical" and "attempting to lie your way out or excuse your way out of somebody's house." R.R. vol. 11 pp 93-94.

Ms. Francis then noticed the purse which Appellant had been dumped out on the bed. R.R. vol. 9 p. 119. When she confronted him, Appellant flatly denied having gone through her purse. R.R. vol. 9 p. 120. Realizing she was confronting a "bad person, a criminal" in her own home, Ms. Francis began to back out of the house, back into the garage. R.R. vol. 9 p. 120. As she began to get her cell phone to call 911, Appellant asked for her to give him the phone. R.R. vol. 9 p. 120. Ms. Francis did manage to dial 911, and Appellant then began to ask for Ms. Francis' car keys, stating "I don't want anything else from you. I just want your keys." R.R. vol. 9 p. 123. Ms. Francis testified that when she refused, Appellant "attacked me, assaulted me." R.R. vol. 9 p. 123. Appellant grabbed Ms. Francis in an attempt to grab the purse still in the crook of her arm knocking Ms. Francis to the ground, and causing pain, bruising, and abrasions to Ms. Francis' legs and arm. R.R. vol. 9 p. 123, 140-142, 152. Ms. Francis testified that she could feel pain where Appellant had grabbed her arm for days afterwards. R.R. vol. 9 p. 125. Photographs of scrapes and bruises Ms. Francis suffered in the attack were admitted into evidence as well. R.R. vol. 9 p. 139-141, R.R. vol.13 State's Exhibits 51-53, 62-68.

4

Dr. Cantu admits that Appellant was intentionally and knowingly demanding Ms. Francis' keys as she was backing out of the room, and that the interaction was not in any way consensual on the part of Ms. Francis. R.R. vol. 11 p. 95. He testified that Appellant told him that Appellant had ran out of the house and just "ran into" Ms. Francis, as if it were an accident. *Id*. However, after listening to the 911 call, Dr. Cantu said that it sounded much different than what Appellant had relayed to him in that it "sounds like he wanted to get her keys, and then he took the purse." R.R. vol. 11 p. 97. On cross examination, the State asked if, in light of the 911 call, "does that change your opinion at all about whether or not the defendant intentionally, knowingly or recklessly caused bodily injury to Ms. Francis?" R.R. vol. 11 p. 97. Dr. Cantu responded, "Well, I think I already said that I agreed it was knowingly and intentionally. I just take issue with the – I take issue with the recklessness part." *Id*. However, Dr. Cantu went on to waiver on his answer, eventually denying that Appellant could have acted intentionally, knowingly, or recklessly. R.R. vol. 11 p. 98. When asked on cross examination whether Appellants unwillingness or inability to tell Dr. Cantu everything that happened would impact his analysis since he based his analysis primarily off of the statements of Appellant, Dr. Cantu conceded that "a significant amount of it is what he tells me and what he's written me." R.R. vol. 11 p. 100.

Appellant quickly dumped out the purse, and grabbed the keys for Ms. Francis' car. R.R. vol. 9 p. 126. He then ran to the driveway, and got into the vehicle Ms. Francis had parked there moments before. R.R. vol. 9 p. 126. However, Appellant was unable to figure out how to use the key fob, which had a hidden "switchblade-style" key fob, and required a button to be pressed to expose the key to start the car. R.R. vol. 9 p. 127. While not complicated, the mechanism to open the key was not entirely intuitive, and even Ms. Francis required a demonstration when she purchased the car originally. R.R. vol. 9 p. 153. While Ms. Francis was still sprawled out on the floor of her garage, Appellant ran back to her, screaming "Start the car. Give me your keys." R.R. vol. 9 p. 127-28. Still a bit dazed, Ms. Francis told Appellant that he had the keys, but Appellant again went through the contents of her purse which were now spread on the ground, and ran back to the car with her house keys, attempting to use those to start the car. R.R. vol. 9 p. 128. Even more frustrated, Appellant ran back to Ms. Francis, and again demanded that she start the car, and give him the keys. R.R. vol. 9 p. 129. Appellant was appearing more agitated, and was escalating his behavior after already physically assaulting Ms. Francis, so she told him to just press the button on the car key fob, before she ran out into the driveway screaming for help. R.R. vol. 9 p.p. 129-130, 157.

At that moment, Round Rock Police Officer Jerry Hallford drove around the corner, and observed Ms. Francis flagging him down. R.R. vol. 9 p. 170. When she confirmed that Appellant wasn't supposed to be there, Officer Hallford commanded Appellant to stop. R.R. vol. 9 p.p. 174-176. Appellant then fled on foot, leading Officer Halford on a chase which ranged through backyards, and included Officer Halford deploying his Taser on Appellant three times. R.R. vol. 9. p.p. 177-182. Appellant broke through several fences during the chase, and climbed over the ones he could not simply charge through. *Id.*

Appellant eventually reached a Wal-Mart parking lot, where he got into the passenger seat of an occupied maroon van. R.R. vol. 9 p. 187. Officer Halford observed what he believed to be Appellant physically assaulting the driver of that van, who quickly fell or got out of the van. R.R. vol. 9 p. 188. Appellant then drove off in the van at a high rate of speed, nearly striking a patrol car. R.R. vol. 9 p.p. 188-89.

Round Rock police officer Logan Harper-Hill, the driver of that patrol car, swerved to avoid Appellant, then activated his overhead lights and pursued the maroon van. R.R. vol. 9 p. 224-26. Officer Harper-Hill observed Appellant hit a tree, and continue south on Red Bud Street. R.R. vol. 9 p. 226. After a short chase, Appellant left the road after executing a sharp left turn, drove through several front

yards, and ended up in a ditch. R.R. vol. 9 p. 227. Appellant again began to flee on foot, but Officer Harper-Hill was able to chase him down, and restrain him. R.R. vol. 9 p. 229. After, Appellant remarked that he knew he had made a mistake, and that he would pay for it. R.R. vol. 10 p. 230.

## SUMMARY OF THE ARGUMENT

The trial jury act rationally, reasonably, and correctly when they found Appellant guilty of Burglary of a Habitation, Robbery, as they were entitled to believe that Appellant intentionally entered the victim's home, that the victim was injured while appellant was in the course of committing or attempting to commit theft, and that Appellant intentionally, knowingly, or recklessly caused bodily injury to the victim.

## ARGUMENT

**I. The evidence is legally sufficient to support Appellant's conviction for Burglary of a Habitation as alleged in paragraph two of the indictment.**

*Standard of Review*

A reviewing court must view the evidence in the light most favorable to the verdict and determine whether *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See Jackson v. Virginia*,

443 U.S. 307, 319 (1979); *Garrett v. State*, 851 S.W.2d 853, 857 (Tex. Crim. App.1993). In conducting a review of the legal sufficiency of the evidence, "a reviewing court, '…faced with a record of historical facts that supports conflicting inferences' must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflict in favor of the prosecution, and must defer to that resolution." *Matson v. State*, 819 S.W.2d 839, 8436 (Tex. Crim. App. 1991) (quoting *Jackson v. Virginia*, 443 U.S. 307, 326 (1979); *Farris v. State*, 819 S.W.2d 490, 495 (Tex. Crim. App. 1990)); *see also Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). Reconciliation of evidentiary conflicts is solely a function of the trier of fact. *Losada v. State*, 721 S.W.2d 305, 309 (Tex. Crim. App. 1986).

This standard of review applies to both direct and circumstantial evidence. *See King v. State*, 895 S.W.2d 701, 703 (Tex. Crim. App.1995). On appeal, a reviewing court should not reevaluate the weight and credibility of the evidence, but instead considers only whether the jury reached a rational decision. *See Muniz v. State*, 851 S.W.2d 238, 246 (Tex. Crim. App.1993). The jury determines the credibility of the witnesses and may "believe all, some, or none of the testimony." *Chambers v. State*, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991). Further, an appellate court should determine whether necessary inferences are reasonable

9

"based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." *Sorrells v. State*, 343 S.W.3d 152, 156 (Tex. Crim. App. 2011). Still, it is well-established that the testimony of a sole witness to an offense may constitute legally sufficient evidence to support a conviction. *See Aguilar v. State*, 468 S.W.2d 75, 77 (Tex. Crim. App. 1971) (upholding conviction for assault with intent to murder where only one witness saw defendant with gun); *Davis v. State*, 177 S.W.3d 355, 358-59 (Tex. App.— Houston [1st Dist.] 2005, no pet.) (affirming conviction for aggravated robbery where central issue involved single witness's credibility).

*No Diminished Capacity Doctrine*

Texas does not and has never recognized diminished capacity as an affirmative defense, that is, as a lesser form of the defense of insanity. *Jackson v. State*, 160 S.W.3d 568, 574-75 (Tex. Crim. App. 2005); *see also Mays v. State*, 318 S.W.3d 368, 381 (Tex. Crim. App. 2010); *Ruffin v. State*, 270 S.W.3d 586, 588 (Tex. Crim. App. 2008). The Texas Court of Criminal Appeals has stated:

> [P]resenting evidence of mental illness does not then allow the defense to argue that the defendant is absolutely incapable i.e., does not have the capacity to intentionally or knowingly perform an act. There is simply no defense recognized by Texas law stating that, due to the defendant's mental illness, he did not have the requisite mens rea at the time of the offense because he does not have the capacity, or is absolutely incapable of ever forming that frame of mind.

10

*Jackson*, 160 S.W.3d at 573. Instead, the Court noted that if such evidence is considered by a jury, it should only be reviewed on appeal as a sufficiency of the evidence issue. *Id.*

*Elements of the Offense*

As charged under Tex. Penal Code Ann. § 30.02(a)(3), the offense of Burglary of a Habitation, Robbery, is committed when an actor without the effective consent of the owner, intentionally or knowingly enters a habitation and commits or attempts to commit the felony offense of robbery. Tex. Penal Code Ann. § 30.02(a)(3), *see also* Indictment C.R. p. 51. In the context of burglary, because we value the right to privacy within the home to the highest degree, the very nature of a habitation "inherently provides notice that entry is forbidden." *Salazar v. State*, 284 S.W.3d 874, 877-78 (Tex. Crim. App. 2009) (concept applies to both criminal trespass and to burglary).

Robbery is committed when an actor, in the course of committing theft and with intent to obtain or maintain control of property either (1) intentionally, knowingly, or recklessly causes bodily injury, or (2) intentionally or knowingly places another in fear of imminent bodily injury or death. Tex. Penal Code Ann. § 29.02. Such an act occurs "in the course of committing theft" when it occurs in "an attempt to commit, during the commission, or in immediate flight after the attempt

11

or commission of theft." Tex. Penal Code Ann. § 29.01. It is not necessary for the State to prove that appellant completed the theft in order to establish the underlying offense of robbery or attempted robbery; rather, the jury may have inferred the intent to rob from the circumstantial evidence, including appellant's assaultive conduct. *See Young v. State*, 283 S.W.3d 854, 862 (Tex. Crim. App. 2009); *see also Bustamante v. State*, 106 S.W.3d 738, 740 (Tex. Crim. App. 2003) ("While no completed theft occurred, proof of a completed theft is not required to establish the underlying offense of robbery or attempted robbery"); *Wolfe v. State*, 917 S.W.2d 270, 275 (Tex. Crim. App. 1996). "Immediate flight" is not defined in the statute, however, the Court of Criminal Appeals has deferred to Black's Law Dictionary, noting that "immediate" is defined there as "[o]ccurring without delay; instant," "[n]ot separated by other persons or things," or "[h]aving a direct impact; without an intervening agency." *Sweed v. State*, 351 S.W.3d 63, 69 n.5 (Tex. Crim. App. 2011) (quoting Black's Law Dictionary 751 (7th ed. 1999)).

An actor commits a theft when he unlawfully appropriates property with intent to deprive the owner of property. Tex. Penal Code § 31.03. Appropriation of property is unlawful if it is without the owner's consent. *Id*. To deprive means "to withhold property from the owner permanently or for so extended a period of time

that a major portion of the value or enjoyment of the property is lost to the owner"

Tex. Penal Code § 31.01(2)(A).

**A. There was legally sufficient evidence for a rational jury to find beyond a reasonable doubt that Appellant intentionally or knowingly made non-consensual entry into the home of the victim.**

Appellant admits that, objectively, Shannon Francis did not give permission to Appellant to enter her home, and that no rational person would believe that anyone else had given Appellant such permission. *See Brief for Appellant* at 15. However, Appellant argues there is insufficient evidence as to the intentional nature of Appellant's entry into Ms. Francis' home, an element of burglary. Appellant further states that:

> No one testified about the circumstances surrounding appellant's entry into Ms. Francis' home. And, it is important that there was no testimony or evidence of a forced entry by appellant, which would tend to suggest that he would have known he did not have permission to enter the house.

*Id.* at 16-17. While forced entry is not an element of burglary, the State agrees that such evidence would suggest Appellant knew he did not have permission to enter Ms. Francis' house, given that the very nature of a habitation "inherently provides notice that entry is forbidden." *Salazar v. State*, 284 S.W.3d 874, 877-78 (Tex.

Crim. App. 2009). In fact, Appellant is mistaken as the record does indeed contain evidence of forced entry.

The State called Ms. Francis at trial, where she testified, she and law enforcement officers discovered "a bunch of cracks" in her back door that were not there previously, indicating that Appellant had entered through that door. R.R. vol. 9 p. 137-138. The State entered two photograph exhibits showing the damage to that door. R.R. vol. 13 State's Exhibits 54 and 55. Appellant elicited similar testimony on cross examination of Ms. Francis, confirming that there was damage to that door. R.R. vol. 9 p. 154. Even Appellant's expert, Dr. Robert E. Cantu, testified that Appellant told him "I just kicked down the first door that I came to." R.R. vol. 11 p. 61. It was Dr. Cantu's expert opinion that Appellant intentionally entered Ms. Francis' home without her consent. R.R. vol. 11 p. 91. There was no dispute at trial over Appellant's intent to break into the home of the victim. Both sides presented evidence to that end, with Appellant's trial counsel admitting in closing that "We're not saying that he's not guilty of the Burglary of a Habitation. We are saying he's not guilty of that Robbery." R.R. vol. 11 p. 142.

Further, the jury heard testimony that Appellant had, shortly before, invented another excuse when confronted by a woman about being somewhere he did not have permission to be. At the Payless Shoe Store, Ms. Cortez heard the distinctive

sound of the employee-only area door opening, and confronted Appellant as he was leaving that area of the store. R.R. vol. 9 p. 56. Appellant initially denied even being in the employee-only area, and then elaborated that he was only looking for a bathroom. R.R. vol. 9 p. 56. In reality, he had dumped out and sorted through the contents of the employee's purse, stolen her wallet, and was in flight from that theft when Ms. Cortez confronted him. R.R. vol. 9 p. 56. Later, at Ms. Francis' home, Appellant again presented an unlikely story which was objectively dubious at best. This time, Appellant mumbled something about friends giving him permission to be at Ms. Francis' residence during South by Southwest, despite again having dumped out a purse, and sorted through various valuables. R.R. vol. 9 p. 119. Even Appellant's own expert witness classified Appellant's statements to Ms. Francis as "nonsensical" and "attempting to lie your way out or excuse your way out of somebody's house." R.R. vol. 11 pp 93-94.

Additionally, Appellant began collecting items from Ms. Francis' house once inside, including placing a laptop and a watch in a pillowcase, rifling through a purse left at the home, and putting a camera and PSP handheld gaming device in a backpack he found in the home. R.R. vol. 9 p. 134-136 (Ms. Francis testifying). Such acts indicate that Appellant knew he did not have permission to enter the home.

15

In light of this evidence, a reasonable jury could have found that Appellant had not overcome the general understanding that a habitation inherently provides notice that entry is forbidden. *See Salazar v. State*, 284 S.W.3d 874, 877-78 (Tex. Crim. App. 2009). Specifically, given the testimony and pictures of damage to the victim's back door, the expert evaluation that Appellant intentionally entered the home, and the testimony that Appellant had lied about the employees-only area at the Payless Shoe Store, a reasonable jury could have found that Appellant in fact knew that he did not have permission to enter Ms. Francis' home, and forced entry through the back door. The jury was entitled to, and in fact did, resolve any evidentiary disputes in favor of this conclusion.

**B. There was legally sufficient evidence for a rational jury to find beyond a reasonable doubt that Appellant injured the victim while Appellant was in the course of committing a crime.**

Appellant contends that there was no theft, and therefore no robbery, and therefore no burglary in this case because the evidence, as Appellant views it, does not justify a finding that it was "Appellant's intent to withhold the purse from Francis permanently, or for long enough to significantly destroy the value of or Francis' enjoyment of the property." *Brief for Appellant* at 18. However,

Appellant takes far too narrow a view of the evidence presented at trial and the application of the law to that evidence.

It is not necessary to prove that appellant actually completed the theft in order to establish the underlying offense of robbery or attempted robbery; rather, the jury may infer the intent to rob from the circumstantial evidence, including appellant's assaultive conduct. *See Young v. State*, 283 S.W.3d 854, 862 (Tex. Crim. App. 2009); *see also Bustamante v. State*, 106 S.W.3d 738, 740 (Tex. Crim. App. 2003). Nor is it necessary to prove that Appellant was attempting only to steal Ms. Francis' purse, as "in the course of committing theft" encompasses acts that occur in "an attempt to commit, during the commission, or in immediate flight after the attempt or commission of theft." Tex. Penal Code Ann. § 29.01. Therefore, it would be sufficient evidence to show that Appellant was in the course of committing the theft of any item or items when he assaulted Ms. Francis.

Further, the Court of Criminal Appeals has found that the occurrence of a theft immediately after an assault typically supports an inference that the assault was intended to facilitate the theft, and such an inference alone is sufficient proof of robbery. *See Sorrells v. State*, 343 S.W.3d 152, 157 (Tex. Crim. App. 2011) (citing *Cooper v. State*, 67 S.W.3d 221, 224 (Tex. Crim. App. 2002)). This inference is not negated simply by evidence of an alternate motive which the jury

17

could rationally disregard. *Cooper*, 67 S.W.3d at 224. This is true even when, as in Cooper, the defendant claims to have been hallucinating at the time of the assault, and did not know what he was doing. *See Sorrells*, 343 S.W.3d at 157. The defendant in Cooper was working on a fence with his uncle when he suddenly attacked his uncle, then drove off in his uncle's truck. *Cooper*, 67 S.W.3d at 222. While the defendant testified that he was hearing voices and believed his uncle was attacking a child at the time, the Court of Criminal Appeals held that the jury could have rationally disregarded such evidence. *Cooper*, 67 S.W.3d at 224. Put simply, the State "has always been able to prove robbery by force or threats committed before the theft or attempted theft." *Sorrells*, 343 S.W.3d at 158.

In this case, there is substantial evidence that Appellant was in fact in the course of committing or attempting to commit several thefts. First, the jury could have reasonably inferred that Appellant was in the course of attempting to stealing the car keys from Ms. Francis when he assaulted her, with the intent of stealing her car. Immediately before assaulting Ms. Francis, Appellant stated "I don't want anything else from you. I just want your keys." R.R. vol. 9 p. 123. While Appellant alleges that the only theft relevant to the assault would be the attempted theft of the purse, it should be noted that he did not say "I just want your Louis Vitton purse."

18

*See Brief for Appellant* at 18.[1] Instead, he directly asked for her *keys*, and then attempted to drive off with her car. When Ms. Francis refused, he grabbed her arm, causing pain, and knocking her to the ground in the process. R.R. vol. 9 p. 123, 140-142, 152. Appellant then dumped out the contents of her purse, grabbed the car keys, and ran to her car parked just outside the garage. R.R. vol. 9 p. 126. Unable to open the switchblade style key fob, Appellant again demonstrated his intent when he ran back to where Ms. Francis was still sprawled out on the garage floor, and screamed "start the car. Give me your keys." R.R. vol. 9 p. 127-28. He then sorted through the contents of her purse again, and attempted to use the house keys to start the car. R.R. vol. 9 p. 128. Unsuccessful for a second time, Appellant ran back to Ms. Francis, and again demanded her keys to start the car. R.R. vol. 9 p. 129. Even Appellant's expert Dr. Cantu testified at trial after hearing a recording of the 911 call that it "sounds like he wanted to get her keys, and then he took the purse." R.R. vol. 11 p. 97. Further, after fleeing Ms. Francis' home on foot, Appellant forced a driver out of a different car, and led the police on a short car chase in that vehicle. R.R. vol. 9 p. 187-189. The jury could have inferred that it was similarly his intent at Ms. Francis' home to flee in her car.

---

[1] Appellant claiming that "no theft occurred unless it was appellant's intent to withhold the purse from Francis permanently or for long enough to significantly destroy the value or Francis' enjoyment of the property."

19

Second, there was evidence from which the jury could have reasonably inferred that Appellant intended to steal several items from inside the home shortly before the assault. Therefore, the assault happened in the immediate flight after an attempted or committed theft. Specifically, Appellant had collected several items in a pillow case, including a laptop and a watch, and had placed a camera and a PSP handheld gaming device in Ms. Francis' significant other's backpack as well. R.R. vol. 9 p. 134-136 (Ms. Francis testifying). Appellant took the backpack with the camera and PSP from the Ms. Francis' house and left it in her car, while he left the pillowcase inside the house. *Id.* Dr. Cantu, Appellant's own expert, testified at trial that, in his expert opinion, Appellant intentionally began looking for and collecting items to steal from Ms. Francis' home. R.R. vol. 11 p. 92. While Appellant did not in fact leave the property with those items, the jury could have inferred that the assault happened in the immediate flight from the attempted theft.

Finally, the jury could have reasonably inferred that Appellant intended to take the victim's cell phone, as he demanded that Ms. Francis hand him her cell phone when she took it out to call 911. R.R. vol. 9 p. 120. The jury could have reasonably inferred that Appellant assaulted Ms. Francis in an attempt to obtain possession of the phone, even if he did not in fact actually obtain the phone.

In light of this evidence, the jury could have inferred that Appellant was in the course of a theft, or in immediate flight from an attempted theft of a number of items when he assaulted Ms. Francis. This inference would not be negated simply by evidence of an ulterior motive which the jury could rationally disregard, in this case, simply that Appellant left Ms. Francis' purse on the garage floor. *Cooper*, 67 S.W.3d at 224; *Sorrells*, 343 S.W.3d at 158; *Brief for Appellant* at 18.

Appellant made his intent clear multiple times by verbalizing what he wanted from Ms. Francis, specifically demanding her phone, and repeatedly demanding her car keys in an attempt to drive off with her car. This all happened shortly after Appellant had been rifling through the victim's home, and had already collected some valuables in a pillow case. Therefore, the jury could have rationally disregarded the fact that Appellant did not actually complete a theft, and instead inferred that Appellant attempted multiple thefts. *See Young v. State*, 283 S.W.3d 854, 862 (Tex. Crim. App. 2009); *see also Bustamante v. State*, 106 S.W.3d 738, 740-741 (Tex. Crim. App. 2003). Because committing an assault in the course of an attempted theft is sufficient proof to establish a robbery, a rational jury could have found Appellant guilty beyond a reasonable doubt.

**C. There was legally sufficient evidence for a rational jury to find beyond a reasonable doubt that Appellant assaulted the victim with the relevant mens rea.**

As charged in this case, the jury would need to find beyond a reasonable doubt that Appellant intentionally or knowingly entered a habitation, and in the course of committing a theft and with intent to obtain or maintain control of property either (1) intentionally, knowingly, or recklessly caused bodily injury, or (2) intentionally or knowingly placed another in fear of imminent bodily injury or death. Tex. Penal Code Ann. § 30.02(a)(3), 29.02. Appellant argues that the jury could not have found the elements of robbery, as he believes that no reasonable jury could have found that he intentionally, knowingly, or recklessly caused injury to the victim. However, the jury was presented with some evidence that would indicate that he both (1) intentionally, knowingly, or recklessly caused bodily injury and that he (2) intentionally or knowingly threatened Ms. Francis or placed her in fear of bodily injury.

*i.* *Appellant intentionally, knowingly, or recklessly caused injury to the victim.*

While Appellant does not directly claim on appeal that he could not have formed the adequate mens rea to assault Ms. Francis because of Effexor withdrawals, his expert, Dr. Cantu, did so claim at trial. R.R. vol. 11 p. 98. It is not a valid basis for challenging the sufficiency of the evidence to argue that Appellant did not know what he was doing, or was suffering from a diminished mental state. The Texas Court of Criminal Appeals stated as follows in *Jackson v. State*, 160 S.W.3d 568, 574-75 (Tex. Crim. App. 2005):

> [P]resenting evidence of mental illness does not then allow the defense to argue that the defendant is absolutely incapable i.e., does not have the capacity to intentionally or knowingly perform an act. There is simply no defense recognized by Texas law stating that, due to the defendant's mental illness, he did not have the requisite mens rea at the time of the offense because he does not have the capacity, or is absolutely incapable of ever forming that frame of mind.

*Id.* Texas has never recognized diminished capacity as an affirmative defense, i.e., a lesser form of the defense of insanity. *Id.* at 573. This principle applies here as Appellant's claimed state of mind was allegedly diminished as a result of withdrawals from stopping his Effexor medication. In Texas, a diminished capacity to form the mens rea for an offense is not an affirmative defense, and should only be considered a standard question of failure-of-proof. *Id.*

23

In fact, the *Jackson* case itself provides guidance on how such evidence of diminished capacity is properly used:

> Therefore, the trial judge has discretion to determine whether evidence of mental illness may be presented to negate the element of *mens rea,* or whether the evidence should be excluded on special grounds. If such evidence is admitted, the trial judge additionally has the discretion to determine whether the evidence supports a lesser-included-offense instruction. In cases where such evidence was not admitted, it may be presented in the punishment phase in order to reduce the sentence assessed by the jury.

*Jackson v. State*, 160 S.W.3d at 574. That is what Appellant has already done here. The trial court allowed him to present his expert, Dr. Cantu, despite the State's initial objections, granted him a lesser included offense, and in closing, allowed him to argue to the jury that he did not form the mens rea required for the offense of robbery due to Effexor withdrawal. R.R. vol. 11 p. 41-42, 115, 134-142. That argument was the crux, the theme, and the entirety, of the defense closing argument. Id.

Appellant was allowed to make that defense to the jury, but they, as the trier of fact were free to disagree and they did. What Appellant cannot now do is try to backdoor a diminished capacity defense by arguing the evidence is insufficient solely on the basis that he lacked the ability to form the requisite mental state. Yet that is exactly what Appellant does in multiple sections of his brief. This Court

24

should not overrule the existing precedent described clearly in the *Jackson* case, as would be necessary to grant Appellant the relief he requests.

Appellant does otherwise claim on appeal that a reasonable jury could not have found beyond a reasonable doubt that he acted intentionally, knowingly, or recklessly when he assaulted Ms. Francis. *See Brief for Appellant* at 18-23. Absent the availability of the diminished capacity defense that he is legally prohibited from raising, Appellant claims that the evidence at trial rises only to the level of criminal negligence and not the reckless, knowingly or intentional, mental states required for assault.

Appellant argues in part that, "merely grabbing Francis' arm and reaching for her purse is not conduct that his likely to cause bodily injury," takes issue with the depth of Ms. Francis' description of the struggle, and states that Appellant made no verbal threats or admissions of his mental state. *See Brief for Appellant* at 20.

Yet grabbing a person's arm is conduct that is indeed likely and here, did, cause actual bodily injury. Bodily injury is established by a showing of any amount of physical pain. Tex. Penal Code Ann. § 1.07(a)(8). Despite Appellant's minimization in his brief, Ms. Francis was in fact injured, and she testified to pain to her arm for days, pain to her legs when she was knocked over, and photographs

25

of abrasions and bruises on her legs were admitted into evidence as well. R.R. vol. 9 p. 139-141, R.R. vol.13 State's Exhibits 51-53, 62-68. Certainly grabbing someone's arm can clearly lead to pain. That the intensity of that pain and the possibility of bruising increases the harder the grabber squeezes is common knowledge and common sense. Absent evidence of severe intellectual disability, and there isn't any, Appellant clearly knew that if he grabbed Ms. Francis he might cause her pain and that if he grabbed her harder he might cause her greater pain and possible bruise her.

Ms. Francis testified that, absent even being knocked down, the point on her arm at which Appellant grabbed her hurt for days after the incident. R.R. vol. 9 p. 125. A reasonable jury could have found that the force with which Appellant grabbed Ms. Francis was conduct reasonably certain to cause bodily injury, and which in fact did cause such injury. The jury could have further found that it was either Appellant's conscious intent to cause pain, or that he was aware of but consciously disregarded a substantial and unjustifiable risk that his conduct would cause physical pain to Ms. Francis.

Second, Ms. Francis testified that Appellant "attacked me, assaulted me" only *after* she refused to turn over her car keys to him, and then proceeded to take her car keys and run to her car in an attempt to start it. R.R. vol. 9 p. 123. The State

26

"has always been able to prove robbery by force or threats committed before the theft or attempted theft" and that is exactly what happened in this case. *Sorrells v. State*, 343 S.W.3d 152, 158 (Tex. Crim. App. 2011). Appellant demanded property, used force to obtain the property, then attempted to flee with the property. A jury could have reasonably inferred that the sequence of events alone indicated that Appellant intentionally assaulted Ms. Francis with at least recklessness as to bodily injury.

Further, Appellant's own expert gave conflicting testimony at trial, and the jury was free to disregard the parts of his testimony where he asserted that Appellant could not have acted recklessly in favor of the parts of his testimony which indicated that Appellant could have acted intentionally or knowingly. After hearing Ms. Francis' 911 call, Dr. Cantu said it "sounds like he wanted to get her keys, and then he took the purse." R.R. vol. 11 p. 97. On cross examination Dr. Cantu said that he agreed that Appellant acted knowingly and intentionally regarding his assault on Ms. Francis, and that he just took issue regarding recklessly. *Id*. However, Dr. Cantu went on to waffle on his answer, eventually denying that Appellant could have acted intentionally, knowingly, or recklessly. R.R. vol. 11 p. 98. In light of this contradictory testimony and Ms. Francis' first-hand account of Appellant's appearance and actions, the jury could rationally

27

disregard Dr. Cantu's opinion that Appellant did not act intentionally, knowingly, or recklessly. *See Losada v. State*, 721 S.W.2d 305, 309 (Tex. Crim. App. 1986) (jury is the sole entity to reconcile evidentiary conflicts).

Third, while Appellant takes issue with the depth of Ms. Francis' description of the struggle, she characterized it as an assault throughout the trial and testified to the photos of the bruising to her arm and legs the Appellant left when he grabbed her and forced her to the ground. R.R. vol. 9. p. 140-141. In addition, on cross-examination, Appellant's attorneys had Ms. Francis step down and demonstrate how she was attacked. R.R. vol. 9 p. 151-153. While this Court has only the transcript of the words spoken during that demonstration, the jury had the opportunity to observe that demonstration itself, evaluate it, make credibility judgements about Ms. Francis, and considerate the demonstration in light of Appellant's defense that he did not have any of the mens rea, including recklessness to cause Ms. Francis injury. They considered that evidence, along with all the other evidence, and rejected Appellant's claim.

Finally, Appellant's own statement to police upon his capture that he knew he had made a mistake, and that he would pay for it demonstrates his capacity to grasp the nature of his conduct and his ability to form the mens rea required. R.R. vol. 10 p. 230. This statement also directly contradicts the portions of Dr. Cantu's

28

testimony on which Appellant now relies. The jury was rationally able to resolve that conflict in favor of the conviction, believing that Appellant had either intent, knowledge, or at least acted recklessly when he assaulted Ms. Francis after she denied him her keys. The jury was free to disregard or find not credible those conflicting portions of Dr. Cantu's testimony in light of the remainder of the evidence and the manner in which this testimony arose under cross-examination. R.R. vol. 11 p. 96-99. The jury was far better situated than this Court to evaluate any changes in demeanor, body language, or voice Dr. Cantu exhibited while testifying and entitled to use that information as well, in comparison to early testimony, when weighing which portions of his testimony to believe.

That the jury, in fact, did so is only more reasonable in light of Dr. Cantu's opinions that essentially every other action taken by Appellant was at least intentional in nature. R.R. vol. 11 p. 87-88, 91-92, 95, 101.

> ii.   *Appellant intentionally or knowingly threatened or put Ms. Francis in fear of imminent bodily injury or death.*

Even if the jury found that Appellant did not intentionally, knowingly, or recklessly assault Ms. Francis, they could have reasonably found he intentionally or knowingly threatened Ms. Francis or put her in fear of imminent bodily injury in the course of attempting to commit the theft of her car. "Threatening," as used in

the Penal Code, does not require that the intended victim actually understand and receive the threat, but "placing another in fear of imminent bodily injury" does. *Olivas v. State*, 203 S.W.3d 341, 346-47 (Tex. Crim. App. 2006). Evidence of actual fear is relevant to an allegation that the actor *threatened* the victim, but crucial inquiry remains focused on the whether the accused intended to instill such fear. *Id*. An act is threatening "not only when the actor actually causes fear in another, but also (1) when he creates an unacceptable risk that another may be placed in fear, and (2) when he increases the likelihood that he will carry through on a threat and cause a physical injury." *Id*.

By the time Appellant knocked Ms. Francis to the ground, she had already seen that he had gone through some belongings in her bedroom, that he was acting erratically, and that he had demanded she give him her car keys. R.R. vol. 9 p. 123. Ms. Francis was so concerned that she had already called 911, and a recording of that call was entered into evidence. *Id*. Appellant then ran to her car and attempted to start it. R.R. vol. 9 p. 127. Unable to do so, he ran back to Ms. Francis, who was still sprawled out on the hard garage floor after he knocked her down, and screamed for her to "Start the car, give me your keys." R.R. vol. 9 p. 127-28. Appellant repeated this process a second time, in an increasingly more agitated manner. R.R. vol. 9 p. 129-130. Ms. Francis, recognizing his escalating behavior

30

and her "very vulnerable position," ran out into the driveway screaming for help. R.R. vol. 9 p. 130.

Even if he did not intentionally, knowingly, or recklessly cause bodily injury to Ms. Francis, a reasonable jury could find that he intentionally or knowingly put Ms. Francis in fear of bodily injury when he repeatedly and aggressively demanded that she give him the keys to her car. Appellant twice screamed at Ms. Francis to give him her car keys, aggressively announcing his intent to commit theft, even after having already knocked her to the ground. Ms. Francis testified that his escalating behavior and previous assault had left her in a position which she deemed vulnerable, and from which the only escape was to run out of her garage, abandoning her belongings. The jury could have reasonably inferred that Ms. Francis was in fact placed in fear of additional bodily injury, and that Appellant intended to put Ms. Francis in fear of imminent bodily injury so that she would surrender control of her car, thereby satisfying one of the alternative means of committing robbery. Tex. Penal Code Ann. § 29.02(a)(2).

## PRAYER

Wherefore, the State respectfully requests that this Court affirm the conviction.

Respectfully submitted,

**Jana Duty**
District Attorney
Williamson County, Texas


  /s/ John C. Prezas
**John C. Prezas**
State Bar No: 24041722
Assistant District Attorney
405 Martin Luther King, Box 1
Georgetown, Texas  78626
(512) 943-1234
(512) 943-1255 (fax)
jprezas@wilco.org

  /s/ Daniel Sakaida
Daniel Sakaida
State Bar No: 24084601
Special Prosecutor
405 Martin Luther King, Box 1
Georgetown, Texas 78626
(512) 943-1234
(512) 943-1255 (fax)
dsakaida@wilco.org

32

## CERTIFICATE OF COMPLIANCE

I certify that, after allowable exclusions, the State's brief contains 7, 498 words in compliance with Rule 9.4 of the Texas rules of Appellate Procedure.

/s/ John C. Prezas_____
John C. Prezas


## CERTIFICATE OF SERVICE

I hereby certify that on September 14, 2015, I electronically filed the foregoing document with the clerk of the court for the Texas Court of Criminal Appeals, using the efile.txcourts.gov system. Via that system, a "Notice of Electronic Filing" was sent to Appellee's appellate attorney of record, Ray Bass, State Bar No. 01884000, 120 W. 8th Street, Georgetown, Texas, 78626, at ray@raybass.com, and to the State Prosecuting Attorney, P.O. Box 13046, Austin, TX 78711-3046, at information@spa.texas.gov.

_/s/John C. Prezas_____
JOHN C. PREZAS