**Opinion issued November 15, 2018**



**In The**

# Court of Appeals

**For The**

# First District of Texas

————————————

**NO. 01-17-00563-CR**

————————————

**BRIAN LEE TURNER, Appellant**

**V.**

**STATE OF TEXAS, Appellee**

**On Appeal from the 21st District Court**
**Burleson County, Texas**
**Trial Court Case No. 14,833\***

**MEMORANDUM OPINION**

Appellant Brian Lee Turner pleaded not guilty to aggravated assault with a

deadly weapon. After a bench trial, the trial court found Turner guilty and sentenced

---

\* Pursuant to its docket equalization authority, the Supreme Court of Texas transferred this appeal from the Court of Appeals for the Tenth District of Texas to this Court. *See* Misc. Docket No. 17–9066, Transfer of Cases from Courts of Appeals (Tex. June 20, 2017); *see also* TEX. GOV'T CODE § 73.001 (authorizing transfer of cases). We are unaware of any conflict between precedent of that court and that of this court on any relevant issue. *See* TEX. R. APP. P. 41.3.

him to seven years' imprisonment. On appeal, Turner asserts that the evidence was insufficient to support his conviction. It was not. We therefore affirm.

## Background

Turner lived with his girlfriend, Lori Griffin, in a camper located on his mother's property. Both Turner and Griffin used methamphetamine and planned to go to rehabilitation treatment on April 1, 2015. The night before they were scheduled to go to treatment, Turner expressed a desire to postpone treatment, and an argument ensued. Turner began hitting Griffin while yelling at her. Turner's mother, Linda Turner, heard the argument from the main house and came to investigate. Turner said that he was going to kill Griffin, so Turner's mother allowed Griffin to stay in her house (away from Turner) overnight.

Early the next morning, April 1, 2015, Turner sent a text message to Griffin requesting a towel, washcloth, soap, and methamphetamine. He said that he would like to come to the main house to get these items. Griffin told him not to come; she instead agreed to leave the items on the hood of her car, located halfway between the camper and the main house. She did not leave methamphetamine for Turner because she believed they were going to rehabilitation treatment that day. When Turner realized he did not receive methamphetamine, he became angry and started banging around the camper. Griffin testified that it sounded like he was taking a hatchet or hammer to the walls of the camper.

2

At Turner's mother's request, Griffin reluctantly went to the camper to check on Turner. Turner's mother agreed to stay on the porch while Griffin did this, but she instead left and took Turner's child to school. When Griffin looked in the open doorway of the camper, she saw Turner on his knees holding a pocket knife to his throat. Turner demanded that Griffin admit she was having an affair or he would kill himself. Griffin did not answer his question and turned away.

As Griffin turned away, she saw Turner stand and "sling" the pocket knife at her. She testified that as she turned away from Turner, all she could think was, "I'm going to feel [the knife] in my back." She had a broken screw in her back and was not sure she would be able to run fast enough to escape. She left because she "wasn't waiting around to find out what he was going to do; whether he was going to throw the knife, whether he was going to come beat the [cr-p] out of me, try to kill me like he had promised the night before."

Griffin ran from the camper to Turner's mother's house, locked the door, and called 911. Griffin told the 911 operator that she wanted a welfare check on Turner. After Turner started banging on the doors and windows of the main house and threatening to kill her, Griffin made a second call to 911, in which she expressed fear that Turner was going to kill her.

When the police arrived, Turner was banging on the door to his mother's house. The investigator at the scene recovered the pocket knife on the floor next to

the doorway in the camper. Turner was taken into custody. In an interview with police, Turner identified the knife as his and admitted that he had threatened to take his own life.

At trial, Griffin testified that she was in an abusive relationship with Turner and that she feared for her life "multiple times a day" for at least five months before the knife incident. She explained that Turner once made her write a letter to a constable confirming his delusions and stating that people in the community were "out to get him." She wrote the letter, even though it was untrue, because she believed Turner would beat her if she did not write it. She testified that when she occasionally went places without Turner, Turner timed her and imposed consequences if she did not return in the allotted time.

When asked why she requested a welfare check in the first 911 call, Griffin said that she wanted someone to come and she was afraid no one would help her because she had asked for help in the past and had not received it. She also worried that Turner would retaliate if he heard her say something negative about him on the phone. She explained that Turner's arrest did not alleviate her fears because he had been arrested before and then released. She worried that once he was released again, he could "come after" her and kill her. When asked why she told several people, including Turner, that she was not afraid, she stated that she lied because she was afraid Turner would get out of jail and retaliate. She thought that if he believed she

4

was helping him, he would be less likely to "come after" her when he got out of jail. And she explained that the day she learned that he would be getting out of jail, she packed her belongings and lived in her truck for a week.

The State presented an expert witness on domestic violence. The expert testified that leaving an abuser places a victim of domestic violence in heightened danger. Therefore, the expert often coaches victims to prepare for the abuse to escalate when the relationship ends. For safety's sake, she routinely advises victims to continue telling the abuser they love them and following old routines.

In addition, Investigator Andrea Murray, the investigating officer, testified. Investigator Murray said that Griffin looked scared and spoke in a whisper when Murray interviewed her on the day of the incident. Murray observed that Griffin had a black eye and a wrist brace. Griffin told her that the injuries were from other altercations with Turner. Investigator Murray testified that she found the pocket knife in the camper, just inside the doorway, next to the wall. The knife blade was open. She explained that both Turner and Griffin described the knife that she found. The knife was admitted into evidence.

Turner identified the knife as belonging to him. He also admitted that he made threats to his life with the knife.

The defense, in turn, presented witnesses and recorded phone calls between Turner and Griffin. One of the defense's witnesses recalled Griffin saying that

5

Turner did not throw the knife at her. In the recordings of the phone calls between Turner and Griffin while Turner was in jail, Griffin can be heard professing her love for him and denying that Turner threw the knife at her. The testimony and recordings also indicated that Griffin told several people that she was not threatened by Turner and was upset that Turner was going to "get in trouble."

Following the presentation of evidence, the trial court found Turner guilty of aggravated assault with a deadly weapon and sentenced him to seven years' imprisonment. Turner appealed.

**Sufficiency of the Evidence**

In his sole issue, Turner asserts there was legally insufficient evidence to support his conviction. Specifically, he argues that there was insufficient evidence to establish that the knife he used was a deadly weapon or that he threatened another with imminent bodily harm. We disagree.

**A.      Standard of Review**

We review the sufficiency of the evidence in the light most favorable to the prosecution and then determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017); *see also Robinson v. State*, 466 S.W.3d 166, 172 (Tex. Crim. App. 2015) (stating that the standard applies both to jury and bench trials). This standard of review requires the appellate court to defer to the "trier

of fact to fairly resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Id.* (citing *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979)). With respect to testimony of witnesses, the factfinder is the sole judge of the testimony's credibility and weight, and when the record supports conflicting inferences, we presume that the factfinder resolved the conflicts in favor of the verdict, and we defer to that determination. *Thomas v. State*, 444 S.W.3d 4, 8 (Tex. Crim. App. 2014) (citing *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789). The weight given to contradictory testimony is at the discretion of the trier of fact who evaluates demeanor and credibility. *Cain v. State*, 958 S.W.2d 404, 408–09 (Tex. Crim. App. 1997).

In a sufficiency inquiry, direct and circumstantial evidence is equally probative. *Tate v. State*, 500 S.W.3d 410, 413 (Tex. Crim. App. 2016). Deference to the trier of fact extends to the inferences drawn from the evidence as long as the inferences are reasonable ones supported by the evidence and are not mere speculation. *Id.* Not every fact presented must directly show that the defendant is guilty, so long as the cumulative force of the evidence is sufficient to support a finding of guilt. *Nowlin v. State*, 473 S.W.3d 312, 317 (Tex. Crim. App. 2015); *see also Villa*, 514 S.W.3d at 232 ("The court conducting a sufficiency review must not engage in a 'divide and conquer' strategy but must consider the cumulative force of all the evidence.").

**B.     Applicable Law**

A person commits an assault if the person "intentionally or knowingly threatens another with imminent bodily injury." TEX. PENAL CODE § 22.01(a)(2). "A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result." *Id.* § 6.03(a). "A person acts knowingly, or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist." *Id.* § 6.03(b). And "[a] person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result." *Id.* Bodily injury is defined as "physical pain, illness, or any impairment of physical condition." *Id.* § 1.07(a)(8).

The offense is enhanced to aggravated assault, a second-degree felony, if the person "uses or exhibits a deadly weapon during the commission of the assault." *Id.* § 22.02(a)(2), (b). A deadly weapon is "anything that in the manner of its use or intended use is capable of causing death or serious bodily injury." *Id.* § 1.07(a)(17)(B).

**C.     Analysis**

With the standard of review and the elements of the crime in mind, we turn to the evidentiary record before us. Sufficient evidence supported the conviction. We

reject Turner's contentions that the evidence did not support the conclusions that (1) he used a deadly weapon during the commission of the assault or (2) he intentionally or knowingly threatened Griffin with imminent bodily injury. We address each of Turner's arguments in turn.

### 1. Deadly weapon

Turner argues that insufficient evidence supports the trial court's determination that he used or exhibited a deadly weapon during the commission of the offense *See* TEX. PENAL CODE § 22.02 (a)(2). We disagree.

A knife is not per se a deadly weapon. *See, e.g.*, *Alvarez v. State*, 556 S.W.2d 612, 614 (Tex. Crim. App. [Panel Op.] 1978); *Hicks v. State*, 723 S.W.2d 238, 240 (Tex. App.—Houston [1st Dist.] 1986, no writ.). But it can become one when "the manner of its use or intended use is capable of causing death or serious bodily injury." TEX. PENAL CODE § 1.07(a)(17)(B); *see also Johnson v. State*, 509 S.W.3d 320, 323 (Tex. Crim. App. 2017) (not all knives are designed for the purpose of inflicting serious bodily injury or death, so "the evidence is sufficient to support the finding in this case only if the jury could have rationally found that [the defendant] used the knife in such a way, or intended to use the knife in such a way, that it was capable of causing serious bodily injury or death.").

To determine whether the knife here was capable of being a deadly weapon in its manner or intended use, we consider the size, shape, and sharpness of the knife,

as well as its capacity to cause death or serious bodily injury, defendant's proximity to the victim, the manner in which the defendant used the knife, and the defendant's words or other threatening actions. *See Johnson*, 509 S.W.3d at 323. "These, however, are just factors used to guide a court's sufficiency analysis; they are not inexorable commands." *Id.* A knife does not need to inflict wounds nor is expert testimony required before it can be determined to be a deadly weapon. *Davidson v. State*, 602 S.W.2d 272, 273 (Tex. Crim. App. [Panel Op.] 1980).

Here, the knife was admitted into evidence. *See Robertson v. State*, 163 S.W.3d 730, 734 (Tex. Crim. App. 2005) (stating when knife is admitted into evidence, the factfinder has "the opportunity to examine the weapon and ascertain for itself whether the weapon had physical characteristics that revealed its deadly nature."). We presume the court observed the knife and its qualities, such as its size, shape, and sharpness. *See id.* Investigator Murray testified that the blade was about two inches long. *See Johnson*, 509 S.W.3d at 324 ("The video shows that [the defendant] was holding the knife by its handle and that just the blade of the knife appears to be a couple of inches long. Based on this, the jury could have reasonably inferred that the knife was large enough and long enough such that it was capable of causing serious bodily injury or death."); *Hicks*, 723 S.W.2d at 239–40 (knife with blade length of two and one-fourth inches was a deadly weapon). The trial court was

10

free to evaluate the knife's characteristics to determine whether it was capable of causing death or serious bodily injury.

The trial court also had before it evidence concerning Turner's words and actions, the manner in which he used the knife, and his proximity to Griffin. Griffin testified that she encountered Turner with the knife to his throat. When Griffin opened the door, Turner was on his knees near the doorway. She explained that he threatened to kill himself if she did not admit to having an affair. When she turned to leave, he threw the knife in her direction. Griffin ran away and believed she would feel the knife in her back. Investigator Murray's testimony places the knife, blade-open, near the entrance to the camper. Finally, Turner identified the knife and admitted that he initially intended to use it to kill himself.

Based on the characteristics of the knife, Griffin's testimony about Turner's words and actions, Turner's proximity to Griffin, and Turner's admission that he intended to use the knife to kill himself, the trial court rationally could have found that the knife was, in the manner of its use or intended use, capable of causing death or serious injury.

### 2. Threat

We likewise hold that the trial court, as factfinder, could have found beyond a reasonable doubt that Turner intentionally or knowingly threatened Griffin with imminent bodily injury. The factfinder "may infer intent from any facts which tend

11

to prove its existence, including the acts, words, and conduct" of the defendant. *Hart v. State*, 89 S.W.3d 61, 64 (Tex. Crim. App. 2002); *Dobbins v. State*, 228 S.W.3d 761, 765 (Tex. App.—Houston [14th Dist.] 2007, pet. dism'd).

Here, there was sufficient evidence for the factfinder to conclude that Turner's actions of displaying a knife, threatening to use it, and throwing the knife at Griffin were reasonably certain to place Griffin in fear or created an unacceptable risk that she would be placed in fear (and was placed in fear). *See, e.g., Keene v. State*, No. 10-15-00389-CR, 2017 WL 1750073 at *2 (Tex. App.—Waco May 3, 2017, pet. ref'd) (mem. op., not designated for publication) (citing *Olivas v. State*, 203 S.W.3d 341, 350 (Tex. Crim. App. 2006)). Again, when Griffin opened the door to the camper, Turner was on his knees with a knife to his throat. When Griffin turned to leave, Turner "came up off his knees and slung the knife at [her]." She ran to the main house, locked the door, and called 911. He followed her to the house.

The trial court heard testimony from Griffin that she was afraid—and reasonably so. She testified that, as she ran away, she was afraid she was going to feel the knife in her back. The record is also replete with evidence that Turner threatened Griffin on several occasions leading up to the incident. The court heard testimony that he routinely placed her in fear of her life. At the time of the incident, she had several other injuries from altercations with him. The night before the incident, he threatened to kill her (and Turner's mother therefore allowed Griffin to

12

sleep in her home). And immediately before the incident, when Griffin did not give Turner methamphetamine, he became irate and started "banging around his house. . . . [I]t sounded like he was taking a hatchet or a hammer to the walls in there." *See Olivas*, 203 S.W.3d at 349 n.41 (Previous incidents with appellant support logical inference that victim was in more cautious state of mind with heightened awareness and was more likely to both perceive threat made by appellant and perceive his acts as constituting threat.).

Turner argues that Griffin later made contrary statements, such as that he did not throw the knife at her and that he was not trying to hurt her. But it is the duty of the factfinder to weigh all evidence and testimony presented and assess credibility. *See, e.g., Thomas*, 444 S.W.3d at 8. In addition to Griffin's testimony at trial, the court (as factfinder) heard the 911 call, Griffin's interview with the responding officer, and recorded conversations between the Griffin and Turner while he was still in jail. The court also heard Griffin's explanation that she told others that Turner did not threaten her because she did not want to make the situation worse. A domestic violence expert provided an explanation for her behavior and statements. The court was free to examine all of the evidence, including the knife and its location.

We presume that the trial court resolved the conflicting testimony in favor of the verdict, and we defer to that determination. *Id.* This record contains sufficient

evidence that Turner intentionally or knowingly threatened Griffin with imminent bodily injury. *See, e.g., Schmidt v. State*, No. 10-07-00003-CR, 2008 WL 2454084, at *4 (Tex. App.—Waco June 18, 2008, pet ref'd) (mem. op., not designated for publication) ("[V]iewed in the light most favorable to the verdict, the evidence is that Schmidt charged at Vercher brandishing a knife and a flashlight in a threatening manner. This constitutes legally sufficient evidence to prove that Schmidt threatened Vercher with imminent bodily injury."); *Keene*, 2017 WL 1750073 at *2.

## Conclusion

We affirm the judgment of the trial court.




Jennifer Caughey
Justice

Panel consists of Chief Justice Radack and Justices Brown and Caughey.

Do not publish.  TEX. R. APP. P. 47.2(b).